**CHEMICAL BANK, Plaintiff,**

v.

**AFFILIATED FM INSURANCE COMPANY, Defendant.**

No. 87 Civ. 1050 (VLB).

United States District Court, S.D. New York.

March 1, 1993.

Michael S. Davis, Henry Lewis Goodman, Zalkin Rodin & Goodman, New York City, for Chemical Bank.

John M. Toriello, Glenn J. Winuk, Haight, Gardner et al., New York City, for Banque Paribas, European American Bank.

Robert S. Fischler, Winston & Strawn, New York City, for National Westminster Bank USA.

Paul J. Giacomo, Tenzer, Greenblatt, et al., New York City, for Andina Coffee, Inc., Andina Trading Corp.

David G. Keyko, Maurice W. Heller, Winthrop Simpson et al., New York City, for American Express Bank.

Franklin M. Sachs, Podvey, Sachs et al., New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

These cases involve claims under maritime insurance policies by financial institutions for losses sustained because fraudulent documents concerning nonexistent coffee shipments became the bases for extensions of credit. After other defendants settled, there remain in litigation Affiliated FM Insurance Company (hereinafter "Affiliated" or "the insurer") as defendant, and Andina Coffee, Inc. and Andina Trading Corp. (collectively "Andina") together with several banks [1] as plaintiffs. The parties have submitted motions for partial summary judgment focusing on the interpretation of the insurance contracts.[2]

The core issues follow:

(a) does a specific clause of the insurance contract covering fraudulent bills of lading ("FBOL") become ineffective because the balance of the policy relates solely to insuring actual goods;

1. Chemical Bank, American Express Bank, Ltd., Banque Paribas, European American Bank, National Westminster Bank USA, Cooperative Centrale Raffiensboerenleenbank, B.A. (the "banks").

2. Chemical Bank without filing its own motion requests the same ruling as the other banks pursuant to Fed.R.Civ.P. 56(d).

(b) does a blanket provision making the policy applicable for "account of whom it may concern" become unavailable to a bank because a Banker's Endorsement describes some specific risks without mentioning the FBOL clause, while concluding as follows: "ALL OTHER TERMS ... REMAINING UNCHANGED" (capitalization in original).

I answer these questions in the negative and grant partial summary judgment to the plaintiff banks pursuant to Fed.R.Civ.P. 56(d). I hold that the Affiliated policies covering purported shipments of coffee to Andina, which are being sued upon by the banks and which are quoted in part below, provided coverage to those banks which extended credit based on fraudulent bills of lading concerning what turned out to be nonexistent coffee shipments.

Because of this ruling and for additional reasons discussed below, I deny the motion of Affiliated for summary judgment.

I deny without prejudice Andina's motion for summary judgment; there has been incomplete development of the facts concerning its role in connection with the events in dispute.[3]

### II

The claims in these actions arise with respect to losses incurred in connection with purported purchases of Colombian coffee from Gonchecol Ltd. ("Gonchecol"), a Colombian exporting company. These "purchases" were financed by the plaintiff banks through issuance of letters of credit in favor of Gonchecol. Most of the losses involved here were sustained because Gonchecol drew down on letters of credit by presenting bills of lading referring to coffee that never existed.

3. See *Mahoney v. Hankin*, 844 F.2d 64 (2d Cir. 1988); *Goddard v. Urrea*, 847 F.2d 765, 769 (11th Cir.1988).

Coffee was purchased from Gonchecol by Andina Coffee, Inc., then headquartered at 120 Wall St., New York City, during actual or purported shipment from the interior of Colombia to export destinations. In order to finance the purchase of coffee from the exporters, Andina borrowed from banks in New York City. Financing was provided by various banks including the plaintiffs in the cases before me through irrevocable letters of credit.[4] The letters of credit called for payment against shipping documents describing the merchandise, such as inland bills of lading [5] evidencing shipment from the interior of Colombia to a Colombian seaport, and copies of "beneficiaries letters" to port forwarders with instructions regarding the shipment of the coffee from Colombia and forwarding of documentation to the bank in New York.

The usual procedure was that when the coffee arrived from an inland point to a Colombian port, the port forwarder would arrange for transloading onto a vessel according to instructions and the inland bill of lading. The ocean bill of lading was consigned to one of the plaintiff banks, with specific reference to a specific letter of credit number. The ocean bill of lading was couriered by the port forwarder to Andina, which presented it to the bank involved for endorsement and release against a "Trust Receipt." Since the ocean bill of lading was consigned to one of the plaintiff banks, Andina could not take delivery until the bank endorsed the bill of lading. Andina then presented the endorsed bill of lading to the ultimate buyer, which normally paid Andina within 7 days. At that time Andina would pay off the loan created when the plaintiff

bank had paid the exporter on the letter of credit.

For several years, it appears that Andina worked with the banks without incident. However, in 1986 in response to bank inquiries about the delay in coffee from Colombia arriving at its destination, Andina told the banks that the exporters had informed Andina that port congestion and increased export taxes were responsible. (Affidavit of John M. Toriello ["Toriello Aff."] ¶ 5; Affidavit of Mark E. Gleason in Opposition to the Motions of Certain Defendants for Summary Judgment ["Gleason Aff."] ¶ 10).

In order to investigate the situation, representatives from various banks traveled to Colombia during August, 1986 (Toriello Aff. ¶ 5) and were informed that approximately 200,000 bags of coffee were not available for shipping, that the truckers' bills of lading presented to effect the draws on the letters of credit with respect to these bags of coffee were false and that the proceeds from the false bills of lading had been used by Gonchecol to pay off other debts (Toriello Aff. ¶ 5; Affiliated Appendix, Exs. K ¶ 7, L ¶ 7, and M ¶ 7).[6]

After learning of the developments in Colombia, Andina and the plaintiff banks gave notice in August and September of 1986 to Affiliated and the London Insurers of their losses from Gonchecol's presentation of fraudulent inland/truck bills of lading. (Toriello Aff. ¶ 5).

### III

The plaintiffs were insured by Affiliated from 1980 to 1986 under a marine open cargo

---

**4.** A letter of credit is defined in *Webster's Third New International Dictionary* (1966) as follows:

"1. a letter addressed by a banker to a correspondent certifying that a person named therein is entitled to draw on him or his credit up to a certain sum.

"2. a letter addressed by a banker to a person to whom credit is given authorizing him to draw on the issuing bank or on a bank in his country up to a certain sum and guaranteeing to accept the drafts if duly made."

**5.** *Webster's* defines a bill of lading as follows:

"1. a written account of goods shipped by any person signed by the agent of the owner of the ship or by its master and acknowledging the

receipt of the goods and promising to deliver them safe at the place directed, dangers of the sea excepted.

"2. a written document issued by a common carrier acknowledging the receipt of the goods named and setting forth the terms of the contract of carriage."

**6.** Plaintiffs and defendants have stipulated that all coffee described on the bills of lading and listed on the Schedule annexed as Exhibit B to the Affiliated Supplemental Appendix never existed, and that these bills of lading are false. Stipulation ¶ 3.

policy; in 1986 Affiliated was replaced as insurer by various London insurers.[7]

A marine open cargo policy can remain in effect for an indefinite time, and is usually tailored to an assured's particular business, with a premium based on the assured's record and experience. See generally L.J. Buglass, *Marine Insurance and General Average in the United States* (2d ed. 1981).

The first item in the Affiliated open cargo policy was a notice describing procedures for filing a claim on the policy. Paragraph 2 of the notice stated: "This policy covers automatically all shipments which come within its scope. It is important that all shipments be reported as soon as known, and amounts declared as soon as ascertained."

The first section of the policy after the notice contained the policy's general provisions. The first paragraph of the general provisions designates Andina as the Assured, and paragraph 2 provides that the interest in the policy was "[f]or account of whom it may concern." This broad definition of those protected by the policy is pertinent to the controversy before me: at the very outset of the policy it is proclaimed that the policy would cover losses to any parties (which would include the plaintiff banks) which are injured by the perils insured against.

Paragraph 4 of the general provisions designates the "Goods Insured" as "all lawful goods and merchandises consisting principally of coffee."

The second section of the Affiliated policy was entitled "INSURING CLAUSES". Paragraph 16, the "Perils Clause", described the maritime perils insured against. The Perils Clause provided:

> Touching the adventures and perils which this Company is content to bear, and take

upon itself, they are of the Seas, Fires, Assailing Thieves, Jettisons, Barratry of the Master and Mariners, and all other like perils, losses and misfortunes, that have or shall come to the hurt, detriment or damage of the said goods and merchandise or any part thereof, except as may be otherwise provided for herein or endorsed hereon.

Numerous other clauses referred only to physical perils.

One clause of the Affiliated policy, typewritten on the printed form and labelled as a "Special Condition," dealt with the coverage of losses occasioned by fraudulent bills of lading ("FBOL").

This clause provided that the policy covered loss occasioned by the acceptance of fraudulent bills of lading:

> This policy covers loss or damage occasioned through the acceptance by the Assured and/or their agents or shippers of fraudulent Bills of Lading and/or shipping receipts and/or messenger receipts. ¶ 37(D).

Endorsement 33 iterated that the policy covers loss caused by acceptance of false bills of lading:

> This policy covers loss or damage occasioned through the acceptance by the Assured and/or their agents or shippers of fraudulent Bills of Lading and/or shipping receipts and/or messenger receipts and/or warehouse receipts and/or truckmen's receipts.
>
> ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

These clauses affirmatively provided coverage in addition to other coverages described more extensively in the policy concerning events affecting physical merchandise.[8]

---

**7.** The essential terms of the London insurers' policy, Marine Open Cargo Policy No. TH–OCP–1811, are the same as those of the Affiliated policy, Marine Open Cargo Policy No. OCP–302.

**8.** The Affiliated policy contains so-called Banker's Endorsements set out at paragraphs 6–13, 24, 30–31, and 36–37. While the Banker's Endorsements did not mention fraudulent bills of lading, neither did they limit the blanket coverage "for the account of whom it may concern" set forth in Paragraph 2 of the general provisions

of the policy, which obviously embraced banks as well as other parties who may have been concerned:

> It is hereby understood and agreed that the [Name of Specific Bank] hereinafter called the Bank, now has or will have delivered to it from time to time title to and control of certain merchandise insured under this policy, or otherwise has or will have an insurable interest therein and that the Bank will be recognized as the Assured under this policy in connection

## IV

Affiliated's primary argument is that the core purpose of the policies involved was to cover physical goods and merchandise (consisting principally of coffee), against losses on the high seas and related hazards to which shipments of merchandise may be exposed. Affiliated Memorandum in Support of Motion for Partial Summary Judgment ("Affiliated Memo") at 8.

Certainly the Affiliated policy was basically intended to provide coverage against injuries caused by loss of goods. This does not mean that other clauses included in the policy which by their terms extended beyond this central objective were rendered void.

■ Courts do not favor interpretations of contracts which render some of their language nugatory. See *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992). Otherwise, the "sanctity of contractual arrangements," *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (en banc), *cert. denied* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978) would be adversely affected. Freedom of contract would be negated. A separate document would be required for each subject to be covered by a complex commercial agreement, with inconvenient consequences for and prejudice to the security of commercial arrangements, which security is one of the objectives of contract law.

■ Where provisions in the Affiliated policy involved in this case were intended to confine coverage to physical goods actually in existence, Affiliated used language appropriate to that task. Absence from the FBOL clause of such terms as "actual," "present," "physical," "coffee," or "merchandise" cannot be ignored. See *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 184 n. 1 (D.C.Cir.1986).[9]

Had the FBOL clause not been intended to cover bills of lading which were fraudulent because the merchandise cited in the bills did not exist, "it could easily have been stated in those terms." *Insurance Co. of North America v. Dayton Tool & Die Works*, 57 N.Y.2d 489, 499, 457 N.Y.S.2d 209, 213, 443 N.E.2d 457, 461 (1982).

Under New York law, concededly applicable here, where there is "a potential ambiguity in the contract ... under settled principles, [it] must be resolved against the insurance companies which drafted the policy ..." *Id.* See also generally, *Societe Generale v. Fed. Ins. Co.*, 856 F.2d 461 (2d Cir.1988); *Blair v. Metropolitan Life Ins. Co.*, 974 F.2d 1219, 1221–22 (10th Cir.1992).

with any loss of or damage to such merchandise for which it shall hold warehouse receipts, bills of lading or other evidence of title or control or in the case of property not represented by such documents in which it shall have an insurable interest evidenced by written entry on the records of the Bank, and that payment for any loss of or damage to such merchandise shall be made directly to the Bank only, to the extent of its insurable interest therein.

This insurance, as to the interest of the Bank, shall not be impaired nor invalidated by any act or neglect of the named Assured nor by failure to comply with any warranty or condition over which the Bank has no control; and this policy shall not be cancelled nor materially changed as to the interest of the Bank unless 10 days' (in case of war risks coverage only, 48 hours') prior written notice of such change or cancellation shall not have been given to the Bank.

This agreement shall not extend the said policy to cover any additional risks, it being especially agreed that the policy does not insure against conversion, misappropriation or other dishonest acts committed by or on behalf of the named Assured. Also, this agreement is subject to the limits of liability named in the policy and to the conditions of any Value Reporting, Full Reporting, Total Insurance or Co–Insurance clauses incorporated therein or attached thereto, it being understood and agreed nevertheless that unintentional error or omission in the making of reports required of the named Assured under this policy shall not prejudice the rights of the Bank to collect hereunder.

ALL OTHER TERMS, CONDITIONS, AND VALUATIONS REMAINING UNCHANGED.

9. Cases rejecting claims for insurance coverage on the ground that risk did not attach because the contested goods were never in transit are not relevant because those cases did not have clauses analogous to the FBOL clause here. See *Starlight Fabrics v. Glen Fall Ins. Co.*, 297 N.Y. 426, 432, 79 N.E.2d 812 (1948); *San–Nap–Pak Mfg. Co., Inc. v. Firemen's Fund Ins. Co.*, 47 N.Y.S.2d 542 (N.Y.Cty.), *aff'd*, 268 A.D. 905, 51 N.Y.S.2d 754 (1st Dep't 1944); see also *Kessler Export Corp. v. Reliance Ins. Co. of Philadelphia*, 207 F.Supp. 355 (E.D.N.Y.), *aff'd*, 310 F.2d 936 (2d Cir.1962).

## V

The insurer Affiliated correctly points out that contracts should be construed as a whole. But there is no reason why a provision which extends coverage with respect to a particular matter [10] may not be effectively included in a policy which otherwise has more limited coverage. See Llewellyn, *Meet Negotiable Instruments*, 44 Colum.L.Rev. 298, 322 (1944); Manning, *Hyperlexis and the Law of Conservation of Ambiguity*, 36 Tax Law. ə 1 at 9 (Fall 1982); Practising Law Institute, *Drafting Documents in Plain Language* (1979, 1981).

## VI

■ The language used in the Affiliated policy was not ambiguous. The clauses in that policy dealing with matters other than fraudulent bills of lading did not eclipse the FBOL provisions, nor was there anything in the Banker's Endorsements (see Note 8, *supra* ) which overcame the broad coverage of the "of whom it may concern" language. Clarity exists.

Basically irrelevant extraneous provisions in the lengthy policy must not be permitted to create ambiguity and thus to prolong litigation and to enhance its cost.[11]

Recourse to extrinsic evidence should not be had in contract interpretation where it is not necessary—it tends to produce uncertainty, legal expense and delay, and it interferes with free-wheeling freedom of negotiation; every word said during bargaining could become a basis for later argument.

This is not a case such as *Williams and Sons Erectors, Inc. v. South Carolina Steel Corp.*, 983 F.2d 1176, 1183–1185 (2d Cir. 1993), where inconsistent provisions created an ambiguity justifying time-consuming and inherently uncertain resort to extrinsic evidence. No ambiguity is present here which would justify resort to extrinsic evidence as in *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4 (2d Cir.1983) and *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986), *cert. denied* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).[12] The issue here is one for the court, as in *French American Banking Corp. v. Flota Mercente Grandcolumbiana*, 925 F.2d 603 (2d Cir.1991) and *American Home Products Co. v. Liberty Mutual Ins. Co.*, 748 F.2d 760 (2d Cir.1984).

## VII

As evidence of the commercial context in which the Affiliated policy was drafted and of the understanding within the insurance industry that the policy covered non-existent goods, plaintiffs point to a Joint Cargo Committee Memorandum (the "London circular") issued by an advisory committee to Lloyd's Syndicates and member companies of the Institute of London Underwriters (Chemical Bank Memorandum at 15–16). I decline to consider this evidence as support for the banks' motion for two reasons: 1) as pointed out *supra*, the language of the policy is not ambiguous; and 2) no evidence has been pinpointed by counsel for the banks concerning the participation of the defendant insurer in the formulation, consideration, implementation or use of the London circular, or concerning subsequent receipt and internal use

---

**10.** The risk posed by fraudulent bills of lading was obviously known to the insurance industry. See, e.g., *Nieschlag & Co. v. Atlantic Mutual Insurance Co.*, 43 F.Supp. 797 (S.D.N.Y.1941), *aff'd*, 126 F.2d 834 (2d Cir.), *cert. denied*, 317 U.S. 640, 63 S.Ct. 31, 87 L.Ed. 516 (1942) (financial loan losses due to fraudulent warehouse receipts for bags of cocoa beans never received); *Scarburgh Co., Inc. v. American Manufacturers Mutual Ins. Co.*, 107 Misc.2d 772, 435 N.Y.S.2d 997 (Sup.Ct.New York Co.1979), *aff'd on opinion below*, 79 A.D.2d 942, 439 N.Y.S.2d 298 (1st Dep't 1981) (warehouse receipts issued to a financing company for non-existent vegetable oils).

**11.** See Fed.R.Civ.P. 1, sentence 2 ("These rules ... shall be construed to secure the just, speedy,

and inexpensive determination of every action"); see also Judicial Improvements Act of 1990, Pub. Law 101–650, 104 Stat. 5089, and in particular, 28 U.S.C. § 473.

**12.** The extrinsic evidence which is in the record on these motions, if considered, would point both ways and thus on balance offer little or no assistance. The one point which appears beyond dispute is that the issue of fraudulent documents concerning nonexistent goods was at the forefront of consideration in the insurance industry during the relevant period, thus indicating that the insurer was on notice that clear language might be desirable if coverage was to be negated.

of that circular within the councils of Affiliated.

The circular, dated January 14, 1983, reads as follows:

### Fraudulent Bills of Lading

The attention of the Joint Cargo Committee has been drawn to the practice of some underwriters who have granted additional cover under oil contracts on the following basis:

'This Policy covers loss or damage through the acceptance by the Assured and/or Agents and/or Shippers of fraudulent Bills of Lading and/or Shipping Receipts and/or Messenger Receipts and/or shipping documents. Also loss or damage caused by the utilization of legitimate Bills of Lading without the authorization and/or consent of the Assured or its Agents.'

The practice is potentially very dangerous and one which is strongly deprecated by the Joint Cargo Committee. It could have the effect of committing Underwriters to financial losses unrelated to any maritime perils and where no cargo of any nature exists.

Underwriters are strongly recommended not to agree to include this undesirable form in any contract. In addition any amendments of this nature should be agreed by all underwriters on the contract. Chemical Appendix, Ex. 28.

Without fuller explication I cannot determine the full significance of this document, but at this juncture without further factual development it may constitute a barrier, albeit not necessarily now in admissible form, to the summary judgment sought by the insurer. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1989), discussed in *Offshore Aviation v. Transcon Lines*, 831 F.2d 1013, 1015 & n. 1 (11th Cir.1987).

Absent further information concerning that circular—its origins, use and relationship to Affiliated—it represents an exceptional circumstance that would require further inquiry if I were otherwise to consider granting summary judgment in favor of Affiliated. Thus, the London circular provides an alternative basis for denying the Affiliated's motion for summary judgment.[13]

**13.** Depending on circumstances not yet fully delineated, including the membership of the committee which issued the London circular and the role, if any, of Affiliated with respect to it, an inter-competitor recommendation such as the London circular concerning terms of trade might be subject to challenge under § 1 of the Sherman Act (15 U.S.C. § 1) as interpreted in, e.g., *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) if affecting United States Commerce, unless exempt under the McCarran Act concerning the business of insurance where state regulation is involved (15 U.S.C. § 1012 et seq.) and not excluded from the exemption by virtue of involving a boycott, or exempted by the limited coverage of foreign activities under the Sherman Act created by 15 U.S.C. § 6a. See Victor & Chou, *U.S. Antitrust Jurisdiction Over Overseas Disputes After Title IV of the 1992 Export Trading Company Act and Timberlane*, 10 Fordham Int'l L.J. # 1 at 1 (Fall 1986).

1976 Prudential factors would, of course, have to be taken into account prior to consideration of any affirmative antitrust claims. *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir.1977); U.S. Dep't of Justice, *Enforcement Guidelines for International Operations* (1988); see also *Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien*, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968).

Consideration of confidential intra-industry recommendations on one side of a bargaining relationship with unorganized parties on the other side, however, creates an imbalance of knowledge and hence unequal bargaining ability. See Hasen, "Efficiency Under Informational Asymmetry," 38 U.C.L.A.L.Rev. # 2 at 391 (1990).

To the extent that joint insurance policy development occurs, the equivalent of legislation affecting interests outside the enacting jurisdiction is created, justifying especially careful judicial scrutiny of the fairness of the results, as when local legislatures act in ways affecting out-of-state interests. See *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Nippert v. Richmond*, 327 U.S. 416, 434, 66 S.Ct. 586, 595, 90 L.Ed. 760 (1946); *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 767–68 n. 2, 65 S.Ct. 1515, 1520 n. 2, 89 L.Ed. 1915 (1945); *Edwards v. California*, 314 U.S. 160, 174, 62 S.Ct. 164, 167, 86 L.Ed. 119 (1941); *South Carolina Highway Dept. v. Barnwell Bros.*, 303 U.S. 177, 184–85 n. 2, 58 S.Ct. 510, 514 n. 2, 82 L.Ed. 734 (1938).

Rejection of intentionally developed joint concepts may be as relevant as any overreaching in such concepts themselves, depending on the circumstances. Only examination of the totality of the circumstances can permit the appropriate inference, or absence of one, to be determined.

The effect of the London circular, if it turns out to have been received and considered by Affiliated, in fact may be (or may not be) to support an inference that the advice was intentionally disregarded by Affiliated and that a result opposite to that recommended in the circular was intended, i.e. the result sought by the banks in the present litigation.

### VIII

The "For the account of whom it may concern" and FBOL clauses of Affiliated's policy are clear and justify partial summary judgment for the banks pursuant to Fed. R.Civ.P. 56(d). I deny Affiliated's motion for summary judgment on that ground.

The questions raised by the London circular present independent grounds on which I deny Affiliated's motion.

SO ORDERED.

See *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962).