[No. 47559-2-I.   Division One.   June 3, 2002.]

COAST TO COAST SEAFOOD, INC., *Respondent*, v. ASSURANCES GENERALES DE FRANCE, ET AL., *Appellants*.

*Christopher W. Nicoll* and *Richard F. Allen* (of *Cozen O'Connor*), for appellants.

*Robert A. Radcliffe, Jacquelyn A. Beatty*, and *W. Eugene Barton* (of *Karr Tuttle Campbell*), for respondent.

COLEMAN, J. — Coast to Coast Seafoods, Inc., ordered large amounts of shrimp from suppliers in Thailand that were to arrive in sealed containers in separate shipments involving various vessels. Although some containers arrived with the shrimp as ordered, others did not. Rather, certain containers had just blocks of ice with a thin layer of shrimp while others contained a mixed array of seafood. When Coast to Coast filed a claim under its marine insurance policy, the various appellants (Underwriters) refused to provide coverage. Coast to Coast sued Underwriters. The trial court granted summary judgment to Coast to Coast. Underwriters appeal arguing that the policy does not cover the loss. Because we conclude that Coast to Coast has not met its burden in proving coverage, we reverse.

## FACTS

In February or March 1997, David Seto of Springland (a trading company) called Stuart Kozloff, president of Coast

to Coast, and offered five containers of black tiger prawns from Magnet & Syndicate, a company in Thailand. Coast to Coast was familiar with the Thai company since it had purchased black tiger prawns and other shrimp from it since 1994. After negotiations over the telephone and a face-to-face meeting with Seto and Ben Chui, a principal of Springland, the parties reached an agreement. Coast to Coast paid 70 percent of the negotiated price upon receipt of the copies of the bills of lading and the balance after inspection. The shipment arrived without incident.[1]

Thereafter, Coast to Coast agreed to purchase a larger shipment of black tiger prawns. For 24 containers, Coast to Coast advanced 80 percent of the negotiated price upon receipt of the bills of lading and planned to pay 20 percent after arrival and clearance by the Food and Drug Administration. The terms of the deal were "C & F" (cost and freight). Each of the 24 containers commenced transit in either Bangkok or Laem Chabang, Thailand. Various feeder vessels carried most of the containers to Kaohsiung, Taiwan; Busan, South Korea; or Singapore for loading onto vessels headed for Los Angeles or Long Beach, California. Only three of the shipments cruised directly to Los Angeles from Laem Chabang. Despite the numerous vessels involved, the bills of lading uniformly described the contents as "FROZEN SEAFOOD PRODUCTS SHRIMP." Many bills listed the various shipment weights along with disclaimers such as "SAID TO WEIGHT [sic]" or "SHIPPER LOADED & COUNT."

Upon delivery, Coast to Coast discovered a problem with the packing after inspecting the sixth and subsequent containers. Frank Sipin, a branch manager, found shrimp only on the upper quarter of a block of ice. Normally, there would be several layers of shrimp throughout the block of ice. Sipin also discovered that some of the shrimp were headless, shell-on shrimp that were poor in quality. Upon

---

[1] According to Bennett Kozloff, Chief Executive Officer of Coast to Coast, the company also purchased octopus from Springland. It is unclear from the record whether the octopus arrived among these five containers or in the next order.

an inspection of other containers, he found cuttlefish, scad, trevally, and other seafood items. Sipin described the mixed packing: "The fish products were apparently stowed in the mid and innermost areas of the containers while the shrimp was at the tailgate of the container, obviously to avoid any suspicion/detection of fraud by customs inspectors."

Bennett Kozloff, Coast to Coast's chief executive officer, notified its insurance carrier and his brother, Stuart, who was out of town. Stuart returned immediately and called David Seto, who seemed surprised and promised to investigate. Stuart also contacted Ben Chui, after several unsuccessful attempts. Chui had planned to come to Seattle but then went directly to Thailand to investigate. Seto and Chui told Kozloff that it was possible that they had mixed up the containers and that they would find out what had happened. After a period, however, Kozloff was unable to reach Seto, Chui, or anyone else at Springfield by telephone. Coast to Coast notified United States Customs, the Federal Bureau of Investigation, and the Thai Embassy about the problem and hired law firms in Hong Kong and Thailand to investigate. It also attempted to obtain shipping details through a customs broker and requested Wells Fargo to locate Seto and Frank Zho, a Springland director. Needless to say, Coast to Coast was unable to recover its losses from Springland or Magnet & Syndicate. As for the shipment, Coast to Coast sold the shrimp through its normal markets and sold the majority of the other seafood as cat food.

After Underwriters denied coverage, Coast to Coast sued them seeking coverage under its marine insurance policy. According to the policy language, the insurance attaches when the goods leave the warehouse: "This insurance attaches from the time the goods leave the warehouse . . . for the commencement of transit and continues during the ordinary course of transit until the goods are delivered to the final warehouse." (Warehouse-to-warehouse clause.) A "shore perils" clause insured the shipments against all risks in transit and on land: "[S]hipments insured 'All Risks' while waterborne are insured 'All Risks'

while in transit or otherwise on land." The term "All Risks" included physical loss or damage to perishable cargo from any external cause, but excluding a preshipment condition, among other things.

Both parties moved for summary judgment based on the policy language. In its cross-motion for summary judgment, Coast to Coast relied primarily on the "unexplained shortage" clause in seeking coverage:

> This insurance is also specially to cover unexplained shortages of goods insured shipped in sealed container(s) whether or not the original seals are intact upon arrival at the final destination, provided that:
>
> A.  the coverage for the shipment includes loss caused by theft; [and]
>
> B.  the Assured makes every attempt to recover the loss from anyone who may have been responsible for the shortage through involvement in stuffing the container.
>
> **It is a condition precedent to this coverage that the Assured shall not divulge the existence of this coverage to any party. Such disclosure shall void coverage provided by this clause.**

After reviewing many documents, the trial court granted summary judgment in favor of Coast to Coast. Underwriters appeal.

## DISCUSSION

■ We review a summary judgment order de novo. *Kimta AS v. Royal Ins. Co.*, 102 Wn. App. 716, 720, 9 P.3d 239 (2000), *review denied*, 142 Wn.2d 1029 (2001). The parties first disagree as to whether federal or state law governs this case. State law governs the interpretation of a marine insurance policy only in the absence of applicable federal statute, judicially created maritime law, or a need for uniform admiralty rules. *Kimta*, 102 Wn. App. at 722. Underwriters contend that judicially established federal maritime law places the burden on Coast to Coast to prove coverage under the policy. Similarly, state law also places

the burden on the insured to prove coverage and, once met, shifts the burden to the insurer to establish a policy exclusion. *Compare Am. Star Ins. Co. v. Grice,* 121 Wn.2d 869, 875, 854 P.2d 622, 865 P.2d 507 (1993) *and Diamaco, Inc. v. Aetna Cas. & Sur. Co.,* 97 Wn. App. 335, 337, 983 P.2d 707 (1999) *with N.H. Ins. Co. v. Martech USA, Inc.,* 993 F.2d 1195, 1200 (1993). As in *Martech,* we need not decide whether federal maritime law or state law sets the burden of proof because each standard produces the same result. *Martech,* 993 F.2d at 1198-99.

■■■ As for interpreting the language in the policy itself, both parties cite to Washington case law for familiar rules of construction. In their reply brief, Underwriters admit that there is no specific federal rule governing the construction of marine insurance contracts. *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26, 30 (2d Cir. 1999). We therefore look to state law to interpret the contract. Washington courts interpret insurance policies as an average purchaser would. *Hayden v. Mut. of Enumclaw Ins. Co.,* 141 Wn.2d 55, 64, 1 P.3d 1167 (2000). Absent mutual agreement on the technical meaning of certain language, we give words their plain, ordinary meaning. *Wolstein v. Yorkshire Ins. Co.,* 97 Wn. App. 201, 210, 985 P.2d 400 (1999). Courts construe insurance policies as a whole, with force and effect given to each clause. *Wolstein,* 97 Wn. App. at 210. All risks marine insurance is not a performance bond and may not provide coverage even when no express exclusion applies. *Wolstein,* 97 Wn. App. at 213-14. *But cf.* 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 19-9, at 469 (3d ed. 2001) ("All risks marine insurance covers all risks of loss or damage that are not expressly excluded.").

■■■ Coast to Coast relies mainly upon the unexplained shortage clause in seeking coverage: "This insurance is also specially to cover unexplained shortages of goods insured shipped in sealed container(s) whether or not the original

seals are intact upon arrival at the final destination."[2] According to Coast to Coast, this clause expands the already broad "all risk" coverage and insures against losses sustained when shipping containers arrive with the product missing, even if the original seals are intact. Underwriters contend that Coast to Coast failed to establish that the insurance attached with proof that the promised goods left the warehouse and commenced transit before a physical loss occurred, citing the warehouse-to-warehouse clause and *Pacific Tall Ships Co. v. Kuehne & Nagel, Inc.*, 76 F. Supp. 2d 886, 892-93 (N.D. Ill. 1999) (defining transit and construing a warehouse-to-warehouse clause). Coast to Coast responds that by including coverage for goods shipped in containers that arrive with their seals intact, the unexplained shortage clause covers cases in which the shipper fails to load the goods into the containers prior to sealing. We disagree. By providing coverage for unexplained shortages in sealed containers, the policy merely accounts for the possibility that the loss could have occurred while in the carrier's possession, even though the seals remained intact. *See Bally, Inc. v. M.V. Zim Am.*, 22 F.3d 65, 70 (2d Cir. 1994) ("Delivery by a carrier of a container with an intact seal does not conclusively prove that loss did not occur while the container was in the carrier's possession."). In reading the policy as a whole, we find that if the goods had left the warehouse and commenced transit but arrived at the final destination inexplicably short, then the unexplained shortages clause may have applied. We conclude, however, that the unexplained shortages clause does not relate back in time and provide coverage for a loss that occurred before the goods left the warehouse. Accordingly, the policy does not cover situations where the shipper fails to pack the goods into the containers prior to sealing.

Nonetheless, Coast to Coast maintains that the broad all risk coverage provisions of the insurance policy

---

[2] Neither party has cited either state or federal law that construes an unexplained shortage clause.

cover the loss, even if the cargo were nonexistent, citing *Chemical Bank v. Affiliated FM Insurance Co.*, 815 F. Supp. 115 (S.D.N.Y. 1993). *Chemical Bank* involved false bills of lading issued by a Colombian exporting company to obtain advance payments under letters of credit for nonexistent shipments of coffee. *Chemical Bank*, 815 F. Supp. at 116-17. When the coffee purchaser and its banks discovered the fraudulent scheme, they tried to obtain coverage from its insurers. *Chemical Bank*, 815 F. Supp. at 117. Because the insurance contract clearly covered a loss caused by the acceptance of fraudulent bills of lading without limiting coverage to physical goods actually in existence, the court entered partial summary judgment in favor of the plaintiffs. *Chemical Bank*, 815 F. Supp. at 118-19, 122. *Chemical Bank* is distinguishable, however, because there is no similar provision in the insurance policy here that covers a loss arising from fraudulent bills of lading. As a result, the policy does not provide coverage for nonexistent goods.

Under our reading of the policy as a whole, Coast to Coast has the burden to prove that the containers left the warehouse and commenced transit with the ordered goods. In its cross-motion for summary judgment, Coast to Coast submitted bills of lading to the trial court as proof of goods shipped. Bills of lading may constitute prima facie evidence that the carrier received the goods as described by identifying marks, number, quantity, or weight. 46 U.S.C. § 1303(3), (4) (Carriage of Goods by Sea Act or COGSA). Disclaimers such as, "said to weigh" and "shipper's load and count" do not affect the evidentiary value of the bills of lading in this regard. *Daewoo Int'l (Am.) Corp. v. Sea-Land Orient Ltd.*, 196 F.3d 481, 485 (3d Cir. 1999); *Bally*, 22 F.3d at 69 (quoting *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir. 1982)); *Fox & Assocs. v. The M/V Hanjin Yokohama*, 977 F. Supp. 1022, 1028 (C.D. Cal. 1997). *But cf. Plastique Tags, Inc. v. Asia Trans Line*, 83 F.3d 1367, 1370 (11th Cir. 1996) (bills of lading were not prima facie proof of amount because the bills contained limiting language and the amount was not verifiable in a sealed container).

Contrary to Underwriters' assertions, the Pomerene Act,[3] which enforces such disclaimers, does not apply to bills of lading issued in foreign ports. 49 U.S.C. §§ 80102, 80113; *Portland Fish Co. v. States S.S. Co.*, 510 F.2d 628, 632-33 (9th Cir. 1974).[4] In *Portland Fish*, the Ninth Circuit relied upon the doctrine of estoppel in imposing liability upon the carrier because the Pomerene Act was not applicable to inbound bills of lading issued in foreign ports. *Portland Fish*, 510 F.2d at 632-33. Moreover, the court explicitly held that the qualification "said to weigh" did not befoul a clean bill of lading. *Portland Fish*, 510 F.2d at 633. Therefore, although the bills of lading state " 'SHIPPER LOADED & COUNT' " or " 'SHIPPER'S PACK LOAD COUNT & SEAL,' " these disclaimers have no effect because the bills of lading were issued in foreign ports.

Anticipating that the disclaimers would not apply, Underwriters argue that the loss of shrimp did not occur during the shipment because the weights of the containers on arrival matched the listed weights of the containers on departure. They cite the warehouse-to-warehouse clause and maintain that the insurance policy applies only to

---

[3] Also known as the Federal Bill of Lading Act. *Portland Fish Co. v. States S.S. Co.*, 510 F.2d 628, 631 (9th Cir. 1974).

[4] In fact, when revising the Pomerene Act, Congress eliminated the applicability of criminal penalties in 49 U.S.C. § 80116 for fraudulent bills of lading issued in foreign ports. *Compare* H.R. Rep. No. 103-80, at 477, 479 (1993) (for consistency with 49 U.S.C. § 80102, "bill of lading subject to this chapter" *substituted for* "bill of lading purporting to represent goods received for shipment . . . *with foreign nations*"), *with United States v. Castro*, 837 F.2d 441, 446 (11th Cir. 1988) (criminal penalties applied to fraudulent bills of lading issued in foreign port). 49 U.S.C. § 80102 states:

This chapter applies to a bill of lading when the bill is issued by a common carrier for the transportation of goods—

(1) between a place in the District of Columbia and another place in the District of Columbia;

(2) between a place in a territory or possession of the United States and another place in the same territory or possession;

(3) between a place in a State and a place in another State;

(4) between a place in a State and a place in the same State *through* another State or a foreign country; or

(5) from a place in a State *to* a place in a foreign country.

(Emphasis added.)

physical loss or damage suffered *in transit* due to an external cause. Many of the cases construing COGSA in determining whether bills of lading constitute prima facie evidence of shipped goods have focused on the weight of the cargo at the outturn or upon arrival. *E.g.*, *Bally*, 22 F.3d at 69-70; *Cont'l Distrib. Co. v. The M/V Sea-Land Commitment*, 1992 U.S. Dist. LEXIS 8895, 1992 WL 75067, at *3-*4 (S.D.N.Y. Mar. 30, 1992). For instance, carriers are liable for shortage of cargo where the weight measured upon arrival is less than the weight listed in the bill of lading. *Westway*, 675 F.2d at 32. If the weight is the same, such evidence may rebut the prima facie case. *Bally*, 22 F.3d at 70 (construing *Westway*, 675 F.2d at 33 n.4). Underwriter's citations to the record, however, do not demonstrate that the weights on the bills of lading are the same as the weights at the outturn. According to our reading of Frank Sipin's declaration, he merely recites the information contained in the bills of lading and does not mention the weights at the outturn. Furthermore, this statement is not determinative because there was a substitution of goods rather than just a shortage.

Although a bill of lading may constitute prima facie evidence of the weight of goods shipped, it is not prima facie evidence of the contents or the condition of goods shipped in a sealed container, even if the bill attests to the "apparent good order and condition" as here. *Daewoo*, 196 F.3d at 485. This is so because the contents of a sealed container are not readily verifiable by external examination of the sealed container. *Daewoo*, 196 F.3d at 485. In *Daewoo*, a Hong Kong company agreed to ship over one million plastic videocassette holders to Daewoo in the United States. *Daewoo*, 196 F.3d at 482-83. Similar to the situation here, the Hong Kong company received payment upon presentation of the shipping documents to the bank issuing the letters of credit. *Daewoo*, 196 F.3d at 483. When Daewoo's agents opened the containers, they discovered cement blocks instead of videocassette holders and incorrect weights listed on the bills of lading. *Daewoo*, 196 F.3d at

483. Like here, the seals of the containers were intact upon arrival and the Hong Kong company had disappeared. *Daewoo*, 196 F.3d at 483-84. In Daewoo's lawsuit against the carriers, the Third Circuit held that Daewoo could not recover based on the bills of lading because it failed to prove that the carriers received the cargo in good condition before shipment. *Daewoo*, 196 F.3d at 485. The court suggested that Daewoo could have designated an agent to inspect the packing of the cargo into the containers prior to sealing. *Daewoo*, 196 F.3d at 485. We find *Daewoo* instructive.

Here, the bills of lading do not prove the contents of the sealed containers upon leaving the warehouse and commencing transit. According to the warehouse-to-warehouse clause, the insurance does not attach until the goods leave the warehouse for the commencement of transit. Coast to Coast has not presented any evidence that the sealed containers left the warehouse with the ordered goods. In fact, in his declaration, Frank Sipin notes that whoever packed the substituted goods did so in a fraudulent manner, placing the substituted fish products in the mid and innermost areas of the containers in an effort to deceive customs inspectors. Besides the substitution of fish, other shipments arrived with blocks of ice containing only a thin layer of shrimp, and much of it was poor in quality. There were a number of shipments, 24 containers in all, loaded aboard various vessels on different dates, passing through numerous ports, and yet almost the entire shipment arrived with either substituted goods or thinly packed shrimp that was substantially poor in quality. A different situation might arise if only one shipment arrived in this manner. Since virtually all the shipments arrived in the same condition, there is an insurmountable inference that the loss or substitution did not occur during transit. The facts indicate that the substituted goods and thin layers of shrimp were packed before the containers left the warehouse pursuant to a scheme to defraud Coast to Coast. In other words, the only reasonable inference is that the goods ordered were never shipped. Based on the totality of the circumstances,

Coast to Coast has failed to demonstrate that the loss occurred subsequent to the time that the insurable interest attached. Accordingly, we conclude that Coast to Coast has not met its burden in proving coverage under the insurance policy. To conclude otherwise would transform the insurance policy into a performance bond.

## CONCLUSION

Because Coast to Coast failed to establish that the loss occurred after the shipment left the warehouse and commenced transit, it did not meet its burden in proving insurance coverage. For this reason, we do not address the shifting burden on Underwriters to prove an applicable exclusion or Coast to Coast's request for attorney fees and costs on appeal pursuant to *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991). We reverse summary judgment in favor of Coast to Coast and direct that judgment be entered in favor of Underwriters.

GROSSE and BAKER, JJ., concur.

Reconsideration denied July 22, 2002.

Review denied at 149 Wn.2d 1001 (2003).