Donald **MAHONEY**, Plaintiff–Appellee,

v.

Joseph N. **HANKIN**, individually and as President of Westchester Community College, Westchester Community College, the County of Westchester, the Board of Trustees of Westchester Community College, and Harold L. Drimmer, individually, and as President of the Board of Trustees of Westchester Community College, Defendants–Appellants.

No. 214, Docket 87–7427.

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1987.

Decided April 12, 1988.

Daniel P. Levitt, New York City (Kramer, Levin, Nessen, Kamin & Frankel, New York City, Linda C. Goldstein, of counsel), for plaintiff-appellee.

Jonathan C. Thau, New York City (Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, Steven M. Levine, Maura E. Mahon, of counsel), for defendants-appellants.

Before LUMBARD, KEARSE, and ALTIMARI, Circuit Judges.

LUMBARD, Circuit Judge:

In 1983 Donald Mahoney filed this civil rights action in the Southern District against the Westchester Community College (the "College"), Joseph N. Hankin, individually and as president of the College, its Board of Trustees, Harold Drimmer, individually and as Chairman of the Board, and the County of Westchester (the "County"), alleging that they violated his rights to free speech, academic freedom and procedural due process by attempting to censor the content of his classroom discussion. He sought both damages and injunctive relief. On April 17, 1987, Judge Stewart denied defendants' motion for summary judgment which raised, *inter alia*, the defense of qualified immunity with respect to all defendants except the County.

The defendants now seek to appeal Judge Stewart's denial of their qualified immunity defense and ask this court to exercise pendent appellate jurisdiction over their other claims and those raised by the County. Mahoney moves to dismiss the appeal on the ground that the denial of the motion for summary judgment is an unappealable interlocutory order. We dismiss the appeal.

I.

Mahoney is a tenured professor of political science at Westchester Community College, a county-supported public educational institution. For many years Mahoney was active in the leadership of the Westchester Community College Federation of Teachers (the "Union" or the "Faculty Union"), serving as the chairman of the Union Grievance Committee from June 1979 to May 1980. The relationship between Mahoney and President Hankin has been poor since Hankin forced Mahoney to resign as Dean of Instruction in 1971.

In 1980, a controversy arose regarding President Hankin's alleged misuse of approximately $2,000 of student activity funds. Allegedly, Hankin used the funds as a sort of "slush fund" to give parties for the Board of Trustees, to pay their parking tickets, and for other purposes not appropriately financed by student fees.

The "slush fund" was the subject of a heated debate at a Faculty Senate Meeting held on February 12, 1980. A Senate committee of inquiry, which included Professor Mahoney, was formed to investigate the matter. Although members of Hankin's staff were present during the Senate meeting, President Hankin elected not to attend.

Shortly thereafter, Hankin sought to obtain the tape recording [1] of the February 12 debate from Professor Constance Saulsbery, the President of the Senate. He claimed that he believed he had been libeled during the Senate deliberations and that the minutes of the February 12 session failed adequately to report comments favorable to him. Professor Saulsbery refused to release the tape. In response, Hankin and Chairman of the Board of Trustees, Harold Drimmer, threatened her with legal action.

During an interview with a New York Times reporter, Hankin stated that the "slush fund" issue was being pursued by faculty members "who don't like me and by

1. Senate meetings are recorded to assist the Secretary in preparing the Senate minutes.

union leadership," singling out Professor Mahoney. Later at a Board of Trustees Meeting, at which Professor Saulsbery appeared, Chairman Drimmer took Professor Saulsbery aside and told her not to worry because "they" wished her no harm, it was Professor Mahoney "they were after."

On April 9, the Board adopted a resolution requiring Professor Saulsbery to produce the tape or to explain her refusal. Professor Saulsbery refused to cooperate. With the aid of the Faculty Union, she retained counsel and resisted the efforts to obtain the tape.

At the end of May 1980, Mahoney and his supporters lost control of the Union leadership. Hankin sent Mahoney a letter dated June 13 which accused Mahoney of violating the provision of the faculty collective bargaining agreement (the "Agreement") dealing with academic freedom. Section 3.13 of the Agreement states in relevant part:

> It is the policy of the College to maintain and encourage full freedom, within the law, of inquiry, teaching and research. In the exercise of this freedom the faculty member may, without limitation, discuss his own subject in the classroom; he may not, however, claim as his right the privilege of discussing in his classroom controversial matter which has no relation to his subject.

After quoting the above section, Hankin continued:

> It has repeatedly come to my attention that you discuss current college matters in your classes without any relation whatsoever to your subject of political science.
>
> Accordingly, I must place you on official notice that if it comes to our attention again that you are engaging in the introduction of such matters unrelated to your subject matter into your classes, we may prefer professional charges against you which may result in your suspension, or other such appropriate action. You will, of course, be permitted to have proper legal counsel present at any hearing which may be held.

The letter indicated that copies were circulated to members of the administration.

Professor Mahoney replied to Hankin by letter dated June 21 and asked for information regarding his alleged violation of Section 3.13. He requested the "dates of alleged violation, class-sessions involved, students involved, subject matter under discussion, and points of discussion where the alleged violation took place."

On June 26, Hankin responded that his letter of June 13 was "quite clear and ... no purpose would be served in listing the information" requested. His letter indicated that copies were sent to the other members of the administration. President Hankin never released the information sought by Professor Mahoney.

Mahoney also received a letter dated June 19 from Arthur Bell, the College Personnel Director, informing him that a copy of the June 13 letter would be placed in his personnel folder as provided by the Agreement. Bell explained that:

> the [letter] will not be placed in your ... folder until you have had the opportunity to respond.... A reasonable period of time would be (3) weeks. If, however, we have not received your material by July 15, 1980, the letter will then be placed in your folder with a statement to the effect that you were given the opportunity to ... respond, but did not do so.

Because Mahoney was away on summer vacation, he did not see Bell's letter until July 10. On July 15, Mahoney had a letter delivered by hand to Bell in which he indicated that three weeks was not a reasonable time to respond since all faculty had left the campus for the summer. He reserved his right to add further material to his file as the matter developed.

Professor Mahoney next wrote President Hankin on August 27, 1980. He stated that he had been unable to exercise the right to reply as explained in the Personnel Director's letter because he did not know with what he was "charged." He again formally requested the factual information sought in the June 21 letter and noted "[b]ecause I do not know with certainty what allegedly you complain of, I can nei-

ther make my own evaluation of your action nor predict with any assurance what subject matters I may continue to pursue in class without provoking a disciplinary proceeding."

On September 23, Hankin replied:

You have been charged with nothing. Rather, as I clearly stated in my letter of June 13, 1980 "it has repeatedly come to my attention that you discuss current college matters in your classes without any relation whatsoever to your subject of political science." Since you have not seen fit to refute that assertion, and in light of the clarity of that assertion, I find your claim of ignorance to be frivolous.

On November 20, Mahoney's attorney wrote to the Office of the President to lodge a grievance under Section 7 of the Agreement with respect to the correspondence with President Hankin. The letter contended that "Hankin's initial letter and his September 23 response to Professor Mahoney's request for particulars violate[d] Professor Mahoney's rights under the Agreement, under the laws of the State of New York, and under the Constitution of the United States." Mahoney demanded a "formal withdrawal of the June 13 and September 23 letters, and a formal apology by the President." He also requested that someone other than Hankin serve as the hearing officer for the grievance. On November 26, President Hankin denied the November 20 request "as untimely." [2]

On December 16, Mahoney's attorney contacted Hankin and indicated that Hankin's denial of the request "as untimely" would be interpreted as a "step 2 [3] decision by you as hearing officer under the Collective Bargaining Agreement." Accordingly, Mahoney formally sought to invoke the AAA arbitration provisions under step 3 of the Agreement.

Step 3 of the grievance procedure provides in pertinent part: "a grievance which is not adjusted under Step 2, may, at the request of the College or the Union within one week of the Step 2 answer, be promptly submitted to arbitration...." Rather than asking the Union to pursue the arbitration request on his behalf, Professor Mahoney attempted to invoke the arbitration clause as an individual. The defendants successfully moved to stay arbitration; the New York Court of Appeals concluded that the Agreement limited "the right to Step 3 grievance arbitration to the college and the union." *County of Westchester v. Mahoney*, 56 N.Y.2d 756, 452 N.Y.S.2d 21, 437 N.E.2d 280 (1982).

Mahoney then brought this civil rights action on January 26, 1983, under the First and Fourteenth Amendments, Sections 1 and 2 of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985(3) and the New York State Constitution. He contends that Hankin's actions violated his rights to free speech, privacy and procedural due process and that the defendants' conduct injured his reputation and professional standing as

2. Section 7.4b of the Agreement states that "[n]o grievance shall be filed later than sixty (60) days after the grievant could have reasonably known of the event constituting the alleged violation."

3. When a grievance has not been satisfactorily adjusted under Step 1 (by writing to the grievant's immediate supervisor), Step 2 of the formal grievance procedure outlined in Section 7.4 provides:

1. In the event that the grievance is not adjusted under Step 1, the faculty member or the Union at the employee's request may within two (2) weeks from the date of the written answer take up such grievance with the President, his designee, or the College Grievance Board at the discretion of the College administration, who will schedule an informal hearing, when requested, within two weeks thereafter.

2. The President or his designee, after a formal hearing where requested, at which the faculty member and his representative may appear and present oral and written statements or arguments, shall answer in writing within two (2) weeks of receipt of the grievance, or two (2) weeks after the hearing, if later.

3. Union–College or College–Union grievances filed under this Agreement may be entered at Step 2 in writing per 7.3b above.

4. The President or his designee, or the Union as the case may be shall answer second step College–Union or Union–College grievances in writing within one (1) week of receipt, or one (1) week after the hearing, if later.

a professor. As a result of Hankin's actions, Mahoney alleges that he no longer allows his classes to be taped, is not as "freewheeling" as he used to be in his class discussions, and has become a social "pariah" on campus because other faculty members are afraid to be seen with him.

On April 15, 1983, Hankin wrote to Mahoney stating that he had not meant to restrict Mahoney's exercise of his academic freedom, that he had removed the June 13 letter from Mahoney's file and that a copy of the present letter was being sent to each individual to whom he sent a copy of the June 13 letter.

The defendants moved for summary judgment on August 15, 1986, and raised for the first time the defense of qualified immunity with respect to all defendants except the County. By opinion dated April 17, 1987, Judge Stewart denied the defendants' motion in its entirety. He concluded that "the defendants are not shielded by the qualified immunity defense because the constitutional rights that they allegedly violated—the rights of freedom of speech, academic freedom, and due process—were clearly established at the time of the conduct in issue." The district court further noted that "[w]hether Mahoney's clearly established rights to freedom of speech and academic freedom were waived under the collective bargaining agreement, ... is a factual matter to be determined at trial."

## II.

The defendants other than the County argue that under *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), they have an absolute right to appeal the denial of their qualified immunity defense. We disagree.

*Mitchell* held that "a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law*, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* at 530, 105 S.Ct. at 2817 (emphasis supplied). The *Mitchell* court "emphasize[d] ... that the appealable issue is a purely legal one: whether the facts alleged ...

support a claim of violation of clearly established law." *Id.* at 528 n. 9, 105 S.Ct. at 2816–17 n. 9.

According to the complaint, Hankin's objections to Mahoney's classroom discussion were not based on concern for the integrity of the education received by students in Mahoney's political science class, but rather were designed to prevent Mahoney from expressing views with which the administration disagreed. According to Mahoney, Hankin's attempts to silence him by threatening disciplinary action violated his rights to free speech, academic freedom and procedural due process.

In evaluating Hankin's qualified immunity defense to these allegations, we must assess the "objective legal reasonableness" of his actions "in light of the legal rules that were 'clearly established' at the time [those actions were] taken." *Anderson v. Creighton*, ——— U.S. ———, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). There is little question that, in the abstract, the law of free speech, academic freedom and procedural due process was "clearly established" at the time of the alleged violations. However, the question here is whether, in light of Section 3.13 of the Agreement, a reasonable college administrator would have understood that attempting to prevent Professor Mahoney from expressing his opinion about the "slush fund" issue during his political science classes by threatening official action for an undisclosed offense violated Mahoney's rights to free speech, academic freedom, and due process.

The meaning that a reasonable college administrator would attach to Section 3.13 is critical to the evaluation of the qualified immunity defense. The scope of this section is a question of fact, not law. Similarly, whether discussion of "slush funds" is related to political science is a question of fact as to which reasonable minds might differ. A denial of a claim of qualified immunity is an appealable final decision only "to the extent that it turns on an issue of law." *Mitchell*, 472 U.S. at 530, 105 S.Ct. at 2817. Since as Judge Stewart noted, the resolution of the qualified immunity defense in this case involves questions of

both law and fact, we conclude that the denial of the claim is not a final order within the meaning of 28 U.S.C. § 1291. *See Group Health Inc. v. Blue Cross Ass'n,* 793 F.2d 491, 497 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1566, 94 L.Ed.2d 758 (1987); *see also Bolden v. Alston,* 810 F.2d 353, 356 (2d Cir.) *cert. denied,* — U.S. —, 108 S.Ct. 229, 98 L.Ed. 2d 188 (1987).

### III.

For the foregoing reasons, this appeal from a nonfinal interlocutory order denying summary judgment is dismissed.