**Dean G. VANNEST, et al., Plaintiffs,**

v.

**SAGE, RUTTY & CO., INC., et al., Defendants.**

**No. 90–CV–1143L.**

United States District Court, W.D. New York.

March 31, 1997.

Earl K. Cantwell, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Andrea R. Moore, Linda H. Joseph, Jaeckle, Fleischmann & Mugel, Buffalo, NY, Edwin M. Larkin, Rochester, NY, for plaintiffs.

Fred G. Aten, Jr., William E. Easton, Gullace & Easton, Rochester, NY, for Sage, Rutty & Co., Inc.

Michael A. Brady, Hagerty & Brady, Buffalo, NY, for Mullen Securities, Inc.

Donald M. Thompson, Rochester, NY, Martin E. Muehe, Muehe & Muehe, Canandaigua, NY,for Joel Johnston.

Vincent S. Tracy, Jr., Tracy, Scott, Davis & Gioia, Buffalo, NY, Robert G. Welch, Philadelphia, PA, for Kenver Assurance Corp. of America, Kenver Corporation, Robert G.

Welch, Pfeiffer House Mortgage Associates, Merion Follansbee Merion Historic Associates.

### DECISION AND ORDER

LARIMER, Chief Judge.

This case arises out of the sale of limited partnership interests. Plaintiffs purchased interests in a limited partnership formed for the purpose of purchasing a first mortgage on an apartment building. The partnership was called Pfeiffer House Mortgage Associates (Pfeiffer House). The general partner was Kenver Assurance Corporation (Kenver), which was owned principally by Robert Welch (Welch). The mortgage was purchased from Follansbee Merion Historic Associates (Follansbee).

Shares in the limited partnership were available pursuant to an August 15, 1986 Private Placement Memorandum (PPM). The plaintiffs made their purchases into the limited partnership through their agent Karpus Investment Management, Inc. (Karpus). Purchases were made via subscription agreements. Sage Rutty was the sales agent or broker/dealer who sold the subscription agreements to Karpus. PNC Bank (PNC) was the escrow agent for the partnership.[1]

In their original complaint, filed in 1990, plaintiffs asserted a RICO claim, federal securities law claims, and common law claims against the defendants, based upon alleged fraud and misrepresentation in the sale of the partnership interests. In *Vannest I*, I dismissed several claims, including plaintiffs' RICO claim. The RICO claim was dismissed with prejudice but plaintiffs were allowed to replead certain other claims and did so by amended complaint dated June 1993. In *Vannest II*, I dismissed additional claims, thus further reducing plaintiffs' claims against the defendants.

Presently before me are four motions: defendant Sage, Rutty's motion for partial summary judgment; defendant PNC's motion for summary judgment; plaintiffs' cross-motion to amend the amended complaint; and PNC's motion for sanctions against plaintiffs.

### 1) Sage Rutty's Motion for Partial Summary Judgment:

To date, the following claims remain against Sage, Rutty:

Count I) Section 10(o) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j; and S.E.C. Rule 10b–5

Count II) Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (for purchases made on or after November 6, 1987)

Count Ill) fraud

Count IV) breach of contract/warranty/fiduciary duty

Count V) negligence and gross negligence (for purchases made on or after November 6,1987)

Sage, Rutty moves for partial summary judgment seeking dismissal of Count II, plaintiffs' Section 12(2) claim; Count IV, plaintiffs' claim for breach of fiduciary duty; and Count V, their claim for negligent misrepresentation. Additionally, Sage, Rutty moves to dismiss all claims of plaintiff Vannest.

### A) Plaintiffs' Section 12(2) Claim:

In relevant part, Section 12(2) states as follows:

Any person who ... offers or sells a security ..., by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading ... shall be liable to the person purchasing such security from him, who may sue ... to recover the consideration paid for such security with interest thereon....

Securities Act of 1933, Section 12(2), 15 U.S.C. § 77l(a)(2).

 Sage, Rutty asserts that this claim cannot be sustained against it because, as a matter of law, Section 12(2) is applicable to

---

1. A more comprehensive description of the background facts is set forth in two prior decisions (*Vannest I* dated October 2, 1992, and *Vannest II* dated December 6, 1993), familiarity with which is assumed.

"public" offerings only and this case involves a "private placement" of securities.[2] Sage, Rutty relies on *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). There, the Supreme Court determined that "prospectus" as used in Section 12(2) is a document used only in a public offering of securities by an issuer or controlling shareholder. Because a prospectus must contain the information contained in the registration statement—*see* Section 10, 15 U.S.C. § 77j—, and because only public offerings require a registration statement, the Supreme Court concluded that a prospectus "is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." 513 U.S. at 584, 115 S.Ct. at 1073–74. Thus, in that case, a private sale of securities was determined to be exempt from the requirements of Section 12(2). *Id.* at 584–85, 115 S.Ct at 1074.

Sage, Rutty asserts that this case is controlled by *Gustafson* because the securities here were purchased through a Private Placement Memorandum. Plaintiffs assert that since *Gustafson,* courts routinely have dismissed Section 12(2) claims based upon statements made in private placement memoranda. *See Lennon v. Christoph,* 1996 WL 57150, 1996 U.S.Dist. LEXIS 9943, *52 (N.D.Ill.1996); *Glamorgan Coal Corp. v. Ratner's Group, P.L.C.,* 1995 U.S. Dist. LEXIS 9548, 1995 WL 406167 (S.D.N.Y. July 1995).

Plaintiffs counter that Sage, Rutty has the burden of proving that the transaction was not a public offering, and that in order not to be a public offering, the transaction must have certain characteristics such as the number of offerees, the offerees' sophistication, the size and manner of the offering and the issuer's relationship to the offerees. *See Koehler v. Pulvers,* 614 F.Supp. 829 (S.D.Cal. 1985). At oral argument, plaintiffs further asserted that the criteria set forth in the Security and Exchange Commission's Rule 506 of Regulation D (concerning the number of purchasers and their sophistication) must be met to qualify as a private offering. *See*

17 C.F.R. 230.506. Thus, plaintiffs assert that a material issue of fact exists as to whether the transactions at issue in this case are public or private offerings.

The *Gustafson* decision has been criticized for making a complex area of law even more confusing. *See, e.g.,* Janet E. Kerr, *Ralston Redux: Determining Which Section 3 Offerings are Public under Section 12(2) after Gustafson,* 50 SMU L.Rev. 175 (1996); Stephen M. Bainbridge, *Securities Act Section 12(2) After the Gustafson Debacle,* 50 Bus. Law. 1231 (1995); Elliott J. Weiss, *Securities Act Section 12(2) After Gustafson v. Alloyd Co.: What Questions Remain?,* 50 Bus. Law. 1209 (1995). The Supreme Court's simple conclusion that Section 12(2) applies only to public offerings does not make the process of determining what is and is not a public offering any simpler. As one commentator has found, the *Gustafson* court's attempt to equate public offerings with those that are registered ignores the important fact that not all public offerings are registered. Kerr, 50 SMU L.Rev. at 187–188. The complex relationship of statutory and regulatory provisions that comprises the federal securities laws insures that determining whether an offer is public, in the shadow of *Gustafson,* is more complex than ever.

Since *Gustafson,* some courts addressing the issue have determined that, by definition, offerings made via a private placement memorandum are not public offerings. *See In re J W.P. Inc. Securities Litigation,* 928 F.Supp. 1239, 1259 (S.D.N.Y.1996)("Courts in this district have held that under *Gustafson,* private placement memoranda like those at issue are not 'prospectuses' for the purposes of a claim under § 12(2)"); *Glamorgan Coal Corp.,* 1995 WL 406167 at *2–*3 (offering made by private placement memorandum not public for Section 12(2) purposes); *see also Whirlpool Financial Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 609, n. 2 (7th Cir.1995), *reh'g denied,* (where the court noted that because a 'prospectus' for Section 12(2) purposes includes only public offerings, Section

---

**2.** While only purchases made on or after November 6, 1987 are subject to the plaintiffs' Section 12(2) claim, plaintiffs apparently assert that these purchases were made in reliance on the August 1986 PPM. Accordingly, the parties' dispute focuses on whether the 1986 offering was truly private, rather than whether Section 12(2) applies to secondary market transactions.

12(2) claims arising from sale of securities offered through a private placement memorandum had been properly dismissed).

Other courts have ruled otherwise. *See Fisk v. SuperAnnuities, Inc.,* 927 F.Supp. 718 (S.D.N.Y.1996)(where the court refused to dismiss Section 12(2) claims even where securities were offered via private placement memorandum where plaintiffs contended that offering was not truly private); *but cf., ESI Montgomery County, Inc. v. Montenay Intern. Corp.,* 899 F.Supp. 1061 (S.D.N.Y. 1995)(where court dismissed Section 12(2) claims where plaintiff acknowledged the offering was made by private offering memoranda, but noted that "had plaintiff alleged that the offering was public it would be premature for the court to assess the weight of [the factors for determining whether an offering is public]").

In this case the PPM expressly (and repeatedly) states that the offering is not subject to registration requirements and that the securities are intended to be sold only to purchasers qualified by the Rule 506 regulations. Clearly the drafters contemplated a private offering.

The plaintiffs have never asserted a Section 12(1) claim—for registration violations[3] —, and they do not dispute that the offering was made pursuant to a private placement memorandum. Although plaintiffs now claim that the offering was not truly a private offering, this assertion, which is made for the first time six years after the complaint was filed, is not compelling. It is evident to me that until *Gustafson* plaintiffs never seriously contested the private nature of the offering at issue.

Thus, based upon my analysis of the facts in this case I choose to follow the reasoning of the *J.W.P. Inc. Securities Litigation* and the *Glamorgan* cases. I find that because the Pfeiffer House offering was made by a Private Placement Memorandum, and because the stated intent at the time was to characterize the offering as private, it was not a "public" offering. Because Section 12(2) is inapplicable to private offerings un-

der *Gustafson,* plaintiffs' Section 12(2) claim against Sage, Rutty is dismissed.

**B) Plaintiffs' Breach of Fiduciary Duty Claim**

██ Sage Rutty moves to dismiss Count IV of the complaint to the extent it alleges a claim for breach of fiduciary duty.

Plaintiffs assert that Sage, Rutty was an underwriter and placement agent for the Pfeiffer House securities. Amended Complaint at ¶ 40. Sage, Rutty denies these characterizations (answer at ¶ 40) but describes itself variously as a "broker-dealer" or a "sales agent" for the Pfeiffer House units. Memo of Law at p. 7. Sage, Rutty's title, however, does not definitively determine whether it had a fiduciary duty to Karpus and/or the other plaintiffs. *Compare Northeast General Corp. v. Wellington Adver., Inc.,* 82 N.Y.2d 158, 163, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993)("A broker in New York ... carries a defined fiduciary duty to act in the best and more involved interests of the principal"); *and Perl v. Smith Barney Inc.,* 646 N.Y.S.2d 678, 680 (1st Dep't)("A broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities"), *leave to appeal denied,* 89 N.Y.2d 803, 653 N.Y.S.2d 281, 675 N.E.2d 1234 (1996). *See also Scott v. Dime Sav. Bank of New York,* 886 F.Supp. 1073, 1079 (S.D.N.Y.1995)("[U]nder New York law, stockbrokers may owe fiduciary duties to their customers."), *aff'd,* 101 F.3d 107 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997).

Thus, whether a fiduciary duty exists cannot be determined by Sage, Rutty's title or "by recourse to rigid formulas." *Scott,* 886 F.Supp. at 1078. Rather, it depends upon "whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Id.* In a nutshell, "[t]he existence of fiduciary duties depends on the facts of a particular relationship." *Boley v. Pineloch*

---

3. Plaintiffs, in their opposition to Sage, Rutty's motion for partial summary judgment and their cross-motion to amend the amended complaint,

sought to add a claim for violations of Section 12(1) of the Act. However, that claim subsequently was withdrawn.

*Assoc., Ltd.,* 700 F.Supp. 673, 680 (S.D.N.Y. 1988).

In this case, Karpus asserts that Sage, Rutty's representative Johnston made various representations to him prior to the sale of Pfeiffer House units to the other plaintiffs. Specifically, Johnston is alleged to have stated to Karpus that the Pfeiffer House investment was a conservative investment alternative to bonds, and that Sage Rutty held Mr. Welch in high regard and was comfortable with his products. Karpus Affidavit at ¶ 6. Prior to the Pfeiffer House offering Sage, Rutty offered and sold to Karpus' clients various municipal bonds and other low-risk investments. Karpus Affidavit at ¶ 5.[4]

Even if I assume the accuracy of these representations, these statements and actions do not constitute the basis for imposing a fiduciary duty between Sage, Rutty and Karpus. The fact that Sage, Rutty sold an undisclosed number of securities to Karpus customers between May and September 1986 does not create a fiduciary relationship. Three or four months is not a particularly long time, and plaintiffs offer no evidence to suggest that these earlier sales were marked by any special circumstances so as to create a fiduciary relationship between Sage, Rutty and Karpus.

Further, the statements made by Johnston in relation to the Pfeiffer House investment are indistinguishable from the types of statements made in the course of any sale. They do not change the nature of the parties' relationship. This is especially so since Karpus was not an unsophisticated individual. He was an experienced (twenty years) "investment advisor."

Thus, Johnston's representations do not convert an ordinary arms-length business relationship into one where Sage, Rutty owed Karpus a special duty. *See Boley,* 700 F.Supp. at 681 (one party's reliance on another party with superior expertise, by itself, will not suffice to establish a fiduciary rela-

tionship); *Greenwald v. Shearson Lehman Brothers, Inc.,* 11/4/93 NYLJ 22 (col.3)(Sup.Ct., N.Y.Cty, 1993)("Merely alleging that plaintiffs had a brokerage account with [defendant broker/dealer] ... or that [defendant's] employee recommended purchase of the security is not enough [to establish a fiduciary duty]"). *See also Moss v. Morgan Stanley,* 719 F.2d 5, 15 (2d Cir. 1983)(no fiduciary duty, for 10b–5 purposes, exists for broker-dealers simply by virtue of their status as market professionals), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

In short, plaintiffs have failed to present sufficient evidence to raise an issue of fact about the Sage, Rutty—Karpus relationship. Thus, that part of Count IV asserting a claim for breach of fiduciary duty against Sage, Rutty is dismissed.[5]

## C) Plaintiffs' Negligence Claim:

Finally, Sage, Rutty moves to dismiss Count V of the amended complaint, for negligent misrepresentation. Sage, Rutty asserts that a fiduciary relationship is a necessary component of a negligent misrepresentation claim. Thus, because no fiduciary relationship exists between it and any of the plaintiffs, this claim too must be dismissed.

■ The elements of a claim for negligent misrepresentation are as follows: (1) carelessness in imparting words, (2) upon which others were expected to rely, (3) upon which they did act or failed to act, (4) to their damage, and (5) the author must express the words directly, with knowledge they will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care. *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 82 (2d Cir.1980)(citing *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977)), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

---

**4.** The relationship between Karpus and Sage, Rutty was initiated only months earlier, in May 1986, when Karpus contacted Sage, Rutty to announce the formation of his investment firm, and to solicit conservative investments for his clients. Karpus Aff't at ¶ 5.

**5.** Nor can a fiduciary relationship exist between Sage, Rutty and any other plaintiff since Sage, Rutty had no contact with any plaintiff other than Karpus.

■ The United States Court of Appeals for the Second Circuit has affirmed that "under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir.1992). While plaintiffs correctly note that language in a decision of the United States District Court for the Southern District of New York suggests that the rule may be otherwise—*see In re Leslie Fay Companies Securities Litigation*, 918 F.Supp. 749 (S.D.N.Y.1996)(the absence of a fiduciary duty does not determine whether there exists a "special relationship" for a negligent misrepresentation claim)—I find that this decision does not change the result in this case. In *Leslie Fay* the court was analyzing the need for **privity** as an element of a negligent misrepresentation claim and whether a fiduciary duty was necessary in the absence of privity. *See id.* at 768–770. The court determined that strict privity was unnecessary and that a relationship of privity or near privity was satisfactory to sustain a negligent misrepresentation claim. *Id.*

In this case, Sage, Rutty does not address the necessity of privity or whether privity exists between these parties. Nonetheless, and regardless of whether privity is sufficient as between Sage, Rutty and all the plaintiffs, I find that the relationship between Sage, Rutty and Karpus lacks the necessary special or fiduciary component necessary to sustain a claim for negligent misrepresentation. *See Stewart*, 976 F.2d at 90; *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63–64 (2d Cir.1988)("The law of negligent misrepresentation ... recognizes that 'generally there is no liability for words negligently spoken' but

that 'there is an exception when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller.' "), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Patell Indus. Mach. Co., Inc. v. Toyoda Mach. U.S.A.*, 880 F.Supp. 96, 99 (N.D.N.Y. 1995)("In order to recover under a negligent misrepresentation theory, plaintiff must allege a special relationship that 'suggests a closer degree of trust and reliance than that of the ordinary buyer and seller' "); *In re Chateaugay Corp.*, 155 B.R. 636, 652 (Bankr.S.D.N.Y.1993)("Under New York law, a plaintiff may recover under a claim for negligent misrepresentation only where there exists a special relationship akin to a fiduciary relationship between the parties"), aff'd, 198 B.R. 848 (S.D.N.Y.1996); *Horn v. 440 East 57th Co.*, 151 A.D.2d 112, 547 N.Y.S.2d 1 (1st Dep't 1989)(where the court noted the requirement of "a fiduciary relationship of trust and confidence" as a component of a negligent misrepresentation claim).

For the same reasons that the parties' relationship did not create a fiduciary duty, no claim for negligent misrepresentation may be asserted here. Sage Rutty and Karpus' relationship was simply that of an ordinary seller and purchaser of securities. The course of dealing between Sage, Rutty and Karpus does not create any special or fiduciary relationship. Accordingly, plaintiffs' negligent misrepresentation claim against Sage, Rutty is dismissed.[6]

### D) Claims by Plaintiff Vannest:

■ Finally, Sage, Rutty moves to dismiss all claims by plaintiff Vannest on the grounds

---

**6.** While not raised by Sage, Rutty, I note that another reason may exist for dismissing both the breach of fiduciary duty and negligent misrepresentation claims. New York's Martin Act, General Business Laws Article 23–A, § 352 *et seq.*, governs fraud and deception in the sale of securities. It is well established that the Martin Act does not provide for a private right of action. *See CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987). Because claims for negligent misrepresentation and breach of fiduciary duty have been considered to be 'covered' by the Martin Act, some courts have dismissed them on the grounds that permitting them to proceed would be equivalent to permitting a private claim under the Martin

Act. *See Independent Order of Foresters v. Donaldson*, 919 F.Supp. 149, 153 (S.D.N.Y.1996)(finding that negligent misrepresentation and breach of fiduciary duty claims are covered by the Martin Act and thus dismissing them to avoid a private action under the Martin Act); *Horn*, 151 A.D.2d at 119, 547 N.Y.S.2d 1 (finding that such claims should be dismissed because "to sustain them would be, in effect, to recognize a private right of action under the Martin Act"); *Rego Park Gardens Owners v. Rego Park Gardens Assoc.*, 191 A.D.2d 621, 622, 595 N.Y.S.2d 492 (2d Dep't 1993)(upholding dismissal of claim for negligent misrepresentation "because this cause of action sought, in essence, to pursue a private cause of action under the Martin Act").

that Vannest was not the "purchaser" of the Pfeiffer House securities. Vannest's shares were purchased by his IRA Rollover and it was not until 1990 that they were sold out of the IRA Rollover and purchased by him individually. This, asserts Sage, Rutty, disqualifies Vannest as a purchaser of securities and defeats his standing to sue on the matter.

Plaintiffs oppose and assert that as the beneficiary of his self-directed IRA account, Vannest has standing to bring these claims because he controlled the investment decisions and, as the beneficiary, it is he who stood to gain or lose from the purchase and or sale of the securities.

I agree with Vannest. Because Vannest controlled the investment decisions, he certainly was a purchaser/seller for all practical purposes. Investors in self-directed IRAs have standing as "purchasers/sellers" to assert claims under the securities laws. *See Atchley v. Qonaar*, 1982 WL 1313 (N.D.Ill. 1982) *reversed on other grounds*, 704 F.2d 355 (7th Cir.1983). Thus, I find that plaintiff Vannest has standing to assert otherwise valid claims.

### 2) PNC Bank's Motion for Summary Judgment

■ As described in the earlier *Vannest* decisions, PNC was the escrow agent for the Pfeiffer House Mortgage Associates, a partnership formed for the purpose of purchasing a mortgage. Pursuant to the original escrow agreement (entered into on August 15, 1986, between PNC and Kenver as General Partner on behalf of all the subscribers in the partnership), PNC's role was to collect and hold investors' monies until such time as $3.2 million was acquired (via subscription agreements), at which time PNC was to transfer the money to the partnership to use to purchase the Follansbee mortgage. If the partnership failed to raise $3.2 million by a certain date all monies collected would be returned to the investors. PNC's role was to terminate upon its disbursement of the funds.

In November 1986, Kenver modified the original escrow agreement (twice) to provide that $3.2 million could be raised by both cash investors (subscribers) as well as by means of an "agreement of participation." This permitted Follansbee to contribute the difference between the amount of cash raised through investors and the required $3.2 million. Follansbee did so, making the mortgage purchase possible.

All of plaintiffs' original claims against PNC have been dismissed except for negligence and breach of contract claims arising out of certain 1986 and 1988 purchases of Pfeiffer House partnership interests. PNC moves for summary judgment dismissing these remaining claims on the grounds that it was merely the escrow agent and had nothing to do with any representations made in the PPM or by anyone else regarding the investment.

PNC asserts that its actions were at all times consistent with its obligations under the escrow agreement and amendments thereto. PNC asserts that, by signing the subscription agreements, each plaintiff became a limited partner in the partnership, and Kenver, as general partner, had power to act for the partnership and thus to make amendments to the escrow agreement. Thus, all of Kenver's modifications were proper and PNC acted in accordance with them.

In response, plaintiffs assert that Kenver did not have authority to make the changes to the escrow agreement because the partnership did not exist until the offering was closed, *i.e.*, after the $3.2 million in finds were obtained and PNC distributed them to the partnership. Essentially, plaintiffs assert that Kenver acted too soon. Kenver's rights and authority as general partner did not become effective until after the offering was consummated. Plaintiffs claim that, until that time, Kenver had no "authority" to act on behalf of the subscribers, and therefore could make no modifications to the escrow agreement.

I think plaintiffs' reasoning is flawed and not consistent with the facts. The subscription agreements expressly state that "I have read and I understand the Partnership Agreement and further understand that, by executing this Subscription Agreement, I will

be executing the Partnership Agreement". Subscription Agreement at p. 8.

The partnership agreement in turn gave Kenver, as general partner, the right to "execute, sign and deliver in furtherance of . . . the purposes of the Partnership, any and all agreements, contracts, documents, . . . necessary or convenient in connection with the business of the Partnership; all of which may contain such terms, provisions and conditions subject to the terms of the [partnership] Agreement, as the General Partner, in its sole and absolute discretion shall deem appropriate." Art. 9.1.4.

I find that there is ample evidence that the partnership existed as of August 15, 1986, well before the offering closed and the sale was consummated. The partnership was registered with the State of Pennsylvania on August 1, 1986, and the subscription agreements and the PPM both refer repeatedly to the partnership and the partnership agreement. Finally, the original escrow agreement states that it is between PNC and "Kenver, as general partner of Pfeiffer House Mortgage Associates." Thus, I see no evidence supporting plaintiffs' assertion that the partnership did not exist until the offering was closed and the funds distributed.

The only evidence offered by plaintiffs is a single "WHEREAS" line from the original escrow agreement stating that "certain Subscribers will become Limited Partners in the Partnership . . ." This clause does not advance plaintiffs' case, however, because at the time of the original escrow agreement (8/15/96), there were no subscribers yet and it appears to me that this reference merely contemplates that, when subscribers were obtained, they would become limited partners.

Thus, I reject plaintiffs' claim that PNC improperly complied with changes to the escrow agreement made by Kenver. The sub-scription agreement adequately provided that, once signed, the purchaser would become a limited partner. Thus, each was subject to all the rights and liabilities set forth in the partnership agreement, including those granting the general partner the right to do the things that it did. This being the case, I find that PNC breached no contract with the plaintiffs nor owed them any duty. Accordingly, no breach of contract or negligence claims can be sustained against PNC. *See Mechigian v. Art Capital Corp.*, 612 F.Supp. 1421, 1430 (S.D.N.Y.1985)(the elements of a negligence claim are: (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty; and (3) damages proximately caused by the breach.)[7] PNC's motion for summary judgment is granted in its entirety.

### 3) Plaintiffs' Cross-motion to Amend the Amended Complaint:

■ Plaintiffs cross-move for leave to amend their amended complaint by adding a civil RICO claim and a claim for conspiracy to violate RICO.[8] Sage, Rutty and PNC vigorously oppose plaintiffs' cross-motion.[9] They assert that because I dismissed with prejudice plaintiffs' previously-asserted RICO claims in *Vannest I*, plaintiffs cannot seek to reassert them now—over four years later. They further assert that permitting plaintiffs to assert this claim would be highly prejudicial because extensive discovery has already taken place and permitting the claim would mean that additional discovery would have to be undertaken.

Plaintiffs assert that their request to reassert the RICO claims is based upon new information, unavailable at the time this Court dismissed their original RICO claim. Plaintiffs assert that the *Vannest I* determination was based upon this Court's finding that the alleged predicate acts all took place

---

7. PNC also moved to dismiss all of plaintiff Vannest's claims on the grounds that Vannest suffered no damages. Because I have dismissed all remaining claims against PNC on other grounds this request is moot.

8. Initially, plaintiffs also sought to add a Securities Act Section 12(1) claim and a breach of contract and breach of fiduciary duty claim.

However, plaintiffs withdrew these requests. Thus, the only remaining claims plaintiffs seek to add are their RICO and conspiracy to violate RICO claims.

9. Defendant Mullan Securities, Inc. also opposed and joined Sage, Rutty and PNC's opposition.

in 1986, and did not meet the continuity requirement for RICO predicate acts. Plaintiffs assert that they now have information showing predicate acts throughout 1987 and 1988. Thus, assert plaintiffs, the holding of *Vannest I,* should not prevent them from reasserting their RICO claims.

Under Fed.R.Civ.P. 15(a) the Court has discretion to grant a plaintiff leave to amend his pleadings, and leave to amend "shall be freely given when justice so requires." "Justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party." *SS. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979). "A court may deny leave to amend where the amended pleading is considered futile, and an amendment is considered futile if the amended pleading fails to state a claim." *Tri–State Judicial Services, Inc. v. Markowitz,* 624 F.Supp. 925, 926 (E.D.N.Y.1985).

In this case I deny plaintiffs' motion for leave to amend because I find that plaintiffs are guilty of undue delay and that defendants would be unduly prejudiced by this amendment. I also conclude that the proposed amendment would be futile.

The actions alleged to have been discovered recently by plaintiffs consist of representations by Sage, Rutty to Karpus in 1987 and 1988 that "after market" units in the Pfeiffer House building were available when, in fact, the units had never been sold in the first instance. Also, plaintiffs allege that PNC was still receiving investors' funds, as escrow agent for the partnership, in 1987 and 1988, long after its term under the original escrow agreement was scheduled to expire. These acts, say plaintiffs, demonstrate an ongoing conspiracy to defraud them.

That Sage, Rutty allegedly made inaccurate representations to the plaintiffs (through Karpus) in 1987 and 1988 is not a recently discovered event. Plaintiffs were aware as early as June 1993 that the 1987 and 1988 purchases were not aftermarket sales, as they alleged such in their amended complaint. *See* Amended Complaint at ¶¶ 63–65. Thus, this information is approximately four years old: not recently discovered by any definition (except possibly in archeological matters). Plaintiffs offer no reason why they waited nearly four years to act on this allegedly critical information. This constitutes undue delay.

Since June 1993, extensive discovery has taken place. Throughout this time discovery has proceeded without any contemplation of a RICO claim because previously I had dismissed it, with prejudice. To allow plaintiffs to amend now and reassert their RICO claim would subject defendants to significant hardship. The extensive discovery that has just been completed would possibly need to be reopened and refocused based upon the existence of the purported new claim. This lawsuit arises out of securities purchased first in 1986 more than a decade ago. I find that reintroducing a RICO claim at this late date would be unduly prejudicial.

Finally, I do not find that the actions cited by plaintiffs would state a RICO claim in any event. Plaintiffs have advanced nothing new to suggest that their RICO claim should be reinstated. I decline to reexamine my prior determination dismissing this claim.

As for PNC's alleged involvement receiving monies after 1986, I am unpersuaded that this demonstrates any predicate act of conspiracy. As stated above, Kenver had authority—pursuant to the partnership documents—to enter into agreements on behalf of the partnership. Thus, there is nothing inherently wrongful or suspicious about any arrangements that may have been made between the partnership and PNC at any time. While the Court is unaware of the reasons for PNC to be receiving investment funds after 1986, this fact alone cannot serve as the basis for a claim of predicate acts under RICO. Indeed, plaintiffs have failed to articulate with any specificity why PNC's involvement as escrow agent after 1986 may constitute fraud.

For all the above reasons, plaintiffs' motion for leave to amend is denied.

### 4) PNC's Motion for Sanctions:

█ Finally, PNC moves the Court to sanction plaintiffs pursuant to Fed.R.Civ.P. Rule 11. PNC asserts that the plaintiffs' attempt to reassert the RICO claim previously dismissed with prejudice, over one month after the deadline for bringing motions, is sanctionable conduct.[10]

Plaintiffs assert that their request to reinstate the RICO claim is not sanctionable because their original RICO claim was dismissed after only minimal discovery and the extensive discovery that has since taken place has provided evidence that the RICO claim should be reinstated.

While I disagree with plaintiffs' conclusion, I do not believe plaintiffs have acted in bad faith or without a reasonable belief that their position was warranted by existing law. *See* Fed.R.Civ. P. 11. Accordingly, I deny PNC's request for sanctions.

### *CONCLUSION*

For all the above reasons, Sage, Rutty's motion for partial summary judgment (152) is granted in part and denied in part; PNC's motion for summary judgment (151) is granted in its entirety; the plaintiffs' cross-motion to amend the amended complaint (165) is denied; and PNC's motion for sanctions (175) is denied.

IT IS SO ORDERED.

---

**10.** PNC originally sought sanctions for plaintiffs' attempt to reinstate their breach of contract and fiduciary duty claims against PNC. Plaintiffs voluntarily withdrew those claims, and PNC's focus is now limited only to the request to add the RICO claims.