**TRINITY INDUSTRIES, INC.,**
Plaintiff–Appellee,

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant–Appellant.**

No. 89–3523.

United States Court of Appeals,
Fifth Circuit.

Nov. 2, 1990.

A. Gordon Grant, Jr., Frederick E. Chemay, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for defendant-appellant.

Scott R. Wheaton, Jr., Samuel F. Reynolds, Jr., Lugenbuhl, Burke, Wheaton, Peck & Rankin, New Orleans, La., for plaintiff-appellee.

Before WISDOM, KING, and BARKSDALE, Circuit Judges.

WISDOM, Circuit Judge:

This case arises out of faulty workmanship in the construction of a vessel, the M/V LEAM ALABAMA. The builder of

the vessel, Halter Marine Inc. (Halter)[1], misaligned two of the modular hull sections during construction, resulting in a seven to twelve inch twist[2] in the vessel.

In this action, Halter has sued the underwriter of its Builder's Risk insurance policy, Insurance Co. of North America (INA), to recover sums that Halter paid to Leam Transportation, Inc. (Leam) as a result of arbitration concerning the twist. The trial court held that the Builder's Risk insurance policy covered sums paid by Halter to satisfy the arbitration award. We hold that the policy does not cover the arbitration award, and therefore reverse.

*Facts and Procedural History*

Neither party disputes the material facts. In December of 1980, Halter agreed to build six 180′ supply boats, including the M/V LEAM ALABAMA, for Leam. The contract included a warranty of workmanlike performance and a clause providing for arbitration in the event of any disputes.

The contract also required Halter to carry Hull, P & I, and Builder's Risk insurance on the vessels during construction. INA provided such coverage to Halter on each of the six vessels using the American Institute Builder's Risk Form (December 1, 1959). Halter and Leam were listed as co-insured and co-loss payees under the policy.

In January of 1982, the M/V LEAM ALABAMA underwent incline and stability tests, with a representative of Leam present. Halter knew of the twist at that time, but did not disclose its existence to the Leam representative, nor did Leam discover the twist during the tests.

Halter delivered the vessel to Leam in early February of 1982. Soon after delivery, trouble with trimming the vessel brought the twist to Leam's attention. Leam made a verbal complaint to Halter in

April of 1982. In June of 1982, pursuant to the terms of the contract, Leam made a written complaint and tendered the vessel for repair.

Halter refused to repair the vessel, based on a belief that the twist was within workmanlike tolerances. In July of 1983, Leam filed for arbitration, claiming $2.3 million in damages. R. 289. Leam argued that the twist rendered the vessel useless and sought return of the purchase price.

Not until February of 1984, did Halter notify INA of its belief that the Builder's Risk insurance policy should cover any award ordered by the arbitration panel. INA denied coverage.

In late 1984, the arbitration panel found that the twist did not significantly affect the performance of the vessel, but that the size of the twist did exceed shipbuilding standards. The panel concluded that the twist violated the warranty of workmanlike performance. The arbitration panel awarded Leam $200,000 for the breach, along with Leam's attorney's fees, costs, and the arbitrators' fees.

A Louisiana district court confirmed the award of the arbitration panel in January of 1985. Soon thereafter, in February of 1985, Halter made a formal demand that INA reimburse Halter for the arbitration award. INA refused.

Halter, therefore, sued INA to recover the arbitration award and to recover Halter's legal fees in defending the arbitration. Halter also sought attorney's fees and statutory penalties for this action, under La.R. Stat. 22:658B, alleging that INA's refusal of coverage was arbitrary, capricious, or without probable cause.

On cross-motions for summary judgment,[3] the trial court held that the arbitration award fell within the language of the

---

**1.** Prior to the entry of the final judgment, Trinity Industries Inc. acquired the assets of Halter. The trial court granted Trinity's motion to replace Halter as the proper party plaintiff. To avoid confusion when referring to the record, we will refer to plaintiff-appellee as Halter.

**2.** A mistake in constructing the vessel caused the starboard aft corner of the vessel to be seven

to twelve inches lower than the port side of the vessel, if the centerline of the vessel were placed perpendicular to the ground.

**3.** Judge Sear decided the coverage issue, but recused himself prior to trial. Judge Arceneaux conducted the bench trial on the remaining issues.

policy. The parties proceeded to trial on the remaining issues: (1) whether INA should have to pay Halter the legal fees that Halter incurred in defending the arbitration action; (2) whether the late notice of the claim prejudiced INA; and (3) whether INA's denial of coverage was arbitrary, capricious, or without probable cause.

After a trial to the bench, the trial court held that INA should pay the legal expenses incurred by Halter in defending the arbitration proceeding, that the late notice did not prejudice INA, and that INA's denial of coverage was arbitrary, capricious, or without probable cause.

INA appeals the grant of summary judgment and the resolution of the issues at the bench trial. Because we hold that the insurance policy does not cover the arbitration award, we reverse without extensively discussing the other issues.

*Discussion*

■■■ Under Louisiana law,[4] a court should interpret an insurance policy under ordinary principles for the interpretation of a contract.[5] The intentions of the parties, as reflected by the words of the policy, should determine the extent of coverage.[6] The words should be given their plain meanings, and the court should not change the coverage of the policy under the guise of interpreting ambiguous language.[7] The court should consider the policy as a whole,

and interpret the policy to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry.[8] If a clause remains ambiguous after such consideration,[9] then it should be construed against the insurer.[10]

■■■ The Builder's Risk policy, in this case, "insures against all risks of physical loss of or damage to the subject matter here insured ...". As the policy makes clear, the subject matter insured is the M/V LEAM ALABAMA itself.

To support the decision of the trial court, Halter argues, first, that the risk of defective workmanship is covered by an "all risks" policy. Halter then points to the twist as damage to the vessel. Because, the twist formed the basis for the arbitration award, Halter argues that the policy should cover the arbitration award.

We have trouble with the notion that a Builder's Risk policy covers the cost incurred by the policyholder to correct faulty workmanship. While we recognize that courts, including ourselves, have used broad language in describing the extent of the coverage provided by an all risks policy,[11] we are convinced that neither party intended for the Builder's Risk policy to cover the cost of repairing plaintiff's mistakes in construction.

4. The parties do not dispute that Louisiana law governs the interpretation of the insurance policy. Under *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), the district court must apply Louisiana's conflict of laws rules. Given that the parties entered into the contract in Louisiana and Halter paid the premiums in Louisiana, Louisiana's conflicts of law rules indicate that Louisiana law governs the interpretation of the policy. *See Aetna Cas. & Sur. Co. v. Evers*, 590 F.2d 600, 601 n. 2 (5th Cir.1979); *Eicher–Woodland Co., Inc. v. Buffalo Ins. Co. of N.Y.*, 198 La. 38, 3 So.2d 268, 271 (1941).

5. *See Breland v. Schilling*, 550 So.2d 609, 610 (La.1989).

6. *See Pareti v. Sentry Indem. Co.*, 536 So.2d 417, 420 (La.1988); La.Civ.Code Ann. arts. 2045–2046 (West 1987).

7. *See Pareti*, 536 So.2d at 420; *see also* La.Civ. Code Ann. arts. 2046–2047 (West 1987).

8. *See Benton Casing Service, Inc. v. Avemco Ins.*, 379 So.2d 225, 231 (La.1979) (on rehearing); La.Civ.Code Ann. arts. 2045, 2050, 2053 & 2054 (West 1987).

9. We do not feel that ambiguity "in the air" justifies a strict construction against the insurer.

10. *See Breland*, 550 So.2d at 610; La.Civ.Code Ann. art. 2056 (West 1987).

11. "A policy of insurance insuring against 'all risks' creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Dow Chemical Co. v. Royal Indem. Co.*, 635 F.2d 379, 386 (5th Cir.1981); Annotation, *Coverage Under "All Risk" Insurance*, 88 A.L.R.2d 1122, 1125 (1963).

We are mindful of the many cases that have found defective workmanship to be a risk covered by all risk policies. These cases, however, have dealt with an accident caused by defective workmanship, not with the cost of replacing or repairing defective workmanship. *Dow Chemical Company v. Royal Indemnity Company* [12] is a representative example. In that case R.B. Butler, Inc. had contracted with the City of El Paso to build four 221–foot thin-shell concrete domes. As a first step in constructing the concrete domes, Dow Chemical, a subcontractor, built a styrofoam dome to be used as a form. After Dow had finished the styrofoam form, concrete was sprayed over the outside of the styrofoam, with the expectation that it would harden.[13] Because Dow improperly constructed the styrofoam form, the dome collapsed before the cement could harden.[14] The Fifth Circuit held that Butler's Builder's Risk policy covered the collapse.[15]

But the facts in *Dow Chemical Co.* and the case before us differ in that in *Dow Chemical Co.* the faulty workmanship led to an accident, the collapse of the dome. In our case, the faulty workmanship, the twist, has not led to any such accident. In fact, in all of the cases cited by plaintiff,[16]

and that we have found,[17] on this issue, faulty workmanship or design led to a discrete event that a reasonable person would call an accident. And, in each case, the court faced the question of whether an all risks policy covered the damage from the resulting accident.[18]

While the distinction is perhaps difficult to see as an abstract concept, it appears relatively clear as a practical matter. Many construction accidents can be traced, at least in part, to some negligence on behalf of the insured. Defective workmanship can lead to the collapse of a cement dome [19] or a brick wall.[20] If an all risks policy did not cover accidents resulting from such negligence, then perhaps it would become a no risk policy, as one plaintiff has suggested.[21]

That it should cover accidents caused by the negligence of the insured does not justify reading such a policy to cover the costs of replacing or repairing crooked window frames or crooked door frames, even though the crookedness of the frame was undoubtedly the result of the insured's negligence.

The language "physical loss or damage" strongly implies that there was an initial

12. 635 F.2d 379 (5th Cir.1981).

13. 635 F.2d at 382.

14. *Id.*

15. 635 F.2d at 391.

16. *Texas Eastern Transmission v. Marine Office of America,* 579 F.2d 561 (10th Cir.1978); *C.H. Leavell & Co. v. Fireman's Fund Ins. Co.,* 372 F.2d 784 (9th Cir.1967); *General American Transp. Corp. v. Sun Ins. Office,* 369 F.2d 906 (6th Cir.1966); *Standard Industr. Steel v. Bethlehem Steel Corp.,* 597 F.Supp. 164 (D.Conn.1984); *Essex House v. St. Paul Fire & Marine Ins. Co.,* 404 F.Supp. 978 (S.D.Ohio 1975); *Associated Engineers v. American Nat'l Fire Ins. Co.,* 175 F.Supp. 352 (N.D.Cal.1959).

17. *Equitable Fire & Marine Ins. Co. v. Allied Steel Constr. Co.,* 421 F.2d 512 (10th Cir.1970); *Teeples v. Tolson,* 207 F.Supp. 212 (D.Ore.1962); *River Road Constr., Inc. v. Canal Indem. Co.,* 538 So.2d 625 (La.Ct.App.1988).

18. *Texas Eastern Transmission,* 579 F.2d at 563–64 (faulty workmanship caused collapse of underground LPG storage cavern); *C.H. Leavell &*

*Co.,* 372 F.2d at 787 (faulty design caused partial collapse of a pipeline suspension bridge); *General American Transp. Corp.,* 369 F.2d at 907–08 (faulty workmanship caused collapse of underground cement silo); *Equitable Fire & Marine Ins. Co. v. Allied Steel Constr. Co.,* 351 F.2d 275, 276 (10th Cir.1965) (faulty workmanship caused partial collapse of an elevated river crossing); *Standard Industr. Steel,* 597 F.Supp. at 194 (faulty design caused damage to bridge lifting cable); *Essex House,* 404 F.Supp. at 980 (faulty workmanship caused partial collapse of a brick wall added to an apartment house); *Teeples v. Tolson,* 207 F.Supp. at 213 (faulty design caused partial collapse of the building); *Associated Engineers, Inc.,* 175 F.Supp. at 353 (contractor negligently backed over pipeline, breaking it); *River Road Constr., Inc.,* 538 So.2d at 626–27 (negligent operation of a crane caused overturning of the crane).

19. *Dow Chemical Co.,* 635 F.2d at 382–83.

20. *Essex House,* 404 F.Supp. at 980.

21. *Kroll Constr. Co. v. Great American Ins. Co.,* 594 F.Supp. 304, 306 (N.D.Ga.1984).

satisfactory state that was changed by some external event into an unsatisfactory state—for example, the car was undamaged before the collision dented the bumper. It would not ordinarily be thought to encompass faulty initial construction.

Thus, when an insured has made claims for the collapse of the insured subject matter because of faulty design, district courts have awarded as damages the cost to rebuild the structure in its defective state.[22] They have not awarded as damages the cost to redesign or rebuild the structure so as to eliminate the defect. This reflects an interpretation of the all risks policy to cover accidents resulting from defective design or workmanship, but not the cost of repairing the defect itself.

Our interpretation of the case law, plus the failure of either Halter or Leam to make a claim on the policy for over two years, convinces us that the parties did not intend the policy to cover the cost of repairing defective initial construction.

Furthermore, even if the parties had intended the policy to require INA to reimburse Halter for all of the work that Halter had to redo on the vessel, Halter has not filed a claim for the twist itself, but rather has filed a claim seeking to recover the money it paid to Leam to satisfy the arbitration award. As to the arbitration award, we hold that the contractual liability of Halter, even though it is based on the twist, is not within the scope of the coverage provided by the policy.

We do not see how the arbitration award qualifies as physical loss or damage. Nor do we see how it could be considered physical loss or damage to the M/V LEAM ALABAMA, which was unchanged in any aspect by the arbitration award.

Admittedly, the arbitration award provides one estimate of the reduction in the value of the M/V LEAM ALABAMA caused by Halter's faulty initial construction.[23] But INA did not participate in the arbitration proceedings and so could not be bound by such a factual finding.[24]

Moreover, we believe that the circumstances surrounding the policy indicate that the parties did not intend for the policy to cover the contractual risks facing Halter. If the policy had been intended to cover the contractual risks, INA would have had to consider the specific contract terms for each vessel in determining the appropriate premium for the policy. Contractual clauses such as warranties and liquidated damages would play critical roles in determining the potential liability of INA. But INA provided a blanket policy to Halter that covered vessels built by Halter beginning in 1972. Despite the fact that these vessels were constructed for a variety of buyers under various contracts, INA set a uniform price for the vessels covered by the policy. Such a uniform policy strongly indicates that neither party intended the policy to cover the idiosyncratic contractual risk associated with each vessel.

In these circumstances, we find that the policy was not ambiguous with respect to coverage for Halter's contractual losses.

The Eleventh Circuit's analysis in *Bender Shipbuilding & Repair Company v. Brasileiro*,[25] while addressed specifically to the Hull Risks and Collision Liability clauses in a Builder's Risk policy, supports our conclusion.

In that case, Bender Shipbuilding and Repair Company, Inc. (Bender) had entered into a contract with Todd Shipyards Corporation (Todd) for the construction of a floating drydock.[26] The Hartford Insurance Company of Alabama (the Hartford) provided a Builder's Risk insurance policy

---

**22.** *See, e.g., Essex House,* 404 F.Supp. at 994.

**23.** We note that the arbitrators found that the twist did not affect the performance of the vessel in any significant way, indicating that zero would be another estimate of the reduction in value.

**24.** *See, e.g., Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552, 559 n. 7 (1979); *Freeman v. Lester Coggins Trucking, Inc.,* 771 F.2d 860, 864–66 (5th Cir.1985).

**25.** 874 F.2d 1551 (11th Cir.1989).

**26.** 874 F.2d at 1553.

to Bender covering the drydock.[27] The contract called for Bender to deliver the drydock by May 27, 1982, and provided for $5,300 a day, for up to ninety days, if Bender delivered the drydock after the contract date.[28] During construction, a storm damaged the drydock and led to its late delivery.[29] Bender eventually settled with Todd for $350,000 plus interest for Bender's breach of the contract delivery date. Bender then sought payment from the Hartford under its Builder's Risk policy. The Court of Appeals for the Eleventh Circuit held that the insurance policy did not cover the contractual liability of Bender.[30] The court based its decision largely on the fact that the Hartford did not know of the specific contractual agreement between Bender and Todd. Because the Hartford did not know the terms of the contract, it could not have estimated the possibility of or the costs associated with a breach of the contract; therefore, the Hartford would have had no way to set an appropriate premium, strongly indicating that the parties did not intend that the policy cover the contractual risks.[31]

The same factors are present in this case. INA did not know of the specific contractual terms between Halter and Leam. Yet INA set a premium for coverage of the M/V LEAM ALABAMA; indeed, INA set uniform premiums for all of the vessels covered by the policy. This, together with the failure of either Halter or Leam, to file the claim for over two years, convinces us that none of the parties intended for the policy to cover Halter's contractual risks to Leam. Therefore, we find that INA is not liable to Halter for the arbitration award.

■ Because we find that the policy does not cover Halter's contractual liabilities to

Leam, we also hold that the Sue & Labor clause [32] does not cover the attorneys' fees incurred by Halter in resolving its contractual dispute with Leam. Halter engaged in arbitration, not to "defen[d], safeguard, or recover[ ]" the M/V LEAM ALABAMA, but to minimize its contractual liability to Leam. The policy does not cover such liability, nor does it cover the cost of resolving disputes involving such liability.

Because we find that the policy does not cover the claim, we reverse the trial court's award of statutory penalties under La.R.S. 22:658 B.

*Conclusion*

We hold that the parties, by their language "physical loss or damage", did not intend to cover the cost of repairing faulty initial construction.

We hold that the parties intended that the policy protect against physical loss or damage to the M/V LEAM ALABAMA itself, and that the parties did not intend to cover the contractual risks of Halter associated with the M/V LEAM ALABAMA. While "all risks" policies are meant to cover a wide variety of risks, they are meant to cover those risks only with respect to a certain specific subject matter. Here, the policy covered the M/V LEAM ALABAMA, not the risk that Halter might breach its contract with Leam.

REVERSED.

---

**27.** *Id.*

**28.** *Id.*

**29.** Bender was already late in delivering the drydock at the time the storm damaged the drydock, but the parties stipulated that the damage caused some further delay in order that the legal issue of coverage could be directly addressed. 874 F.2d at 1553 & n. 1.

**30.** 874 F.2d at 1558, 1561.

**31.** 874 F.2d at 1557–58.

**32.** The clause provides:
In case of any loss or misfortune, it shall be lawful and necessary for the Assured, their Factors, Servants, and Assigns, to sue, labor, and travel for, in, and about the defense, safeguard, and recovery of the subject matter herein insured....