[No. 42857-8-I. Division One. July 6, 1999.]

BERTRAN L. WOLSTEIN, *Appellant*, v. THE YORKSHIRE
INSURANCE CO., LTD., ET AL., *Respondents*.

*Hall Baetz* and *Michele G. Radosevich* of *Davis Wright Tremaine,* for appellant.

*Richard F. Allen, Christopher W. Nicoll, John S. Devlin III,* and *Steven C. Davis* of *Lane Powell Spears Lubersky,* for respondents.

COLEMAN, J. — This is a marine insurance case where the original owner and vessel financier (Bertram Wolstein), as an additional assured on the marine builder's risk insurance policy, seeks to recover from the insurance underwriters for lost charter income, costs to rectify substandard workmanship, and cost overruns in completing a 105-foot yacht that resulted when the original boatbuilder abandoned construction and subsequently declared bankruptcy. The trial court granted the underwriters' motion for summary judgment and dismissed the case with prejudice, finding that there were no covered losses under the marine builder's risk insurance policy. We affirm in part and reverse in part. We reverse the trial court's order with respect to Wolstein's sue and labor claim because there are genuine issues of fact with respect to whether Wolstein took reasonable actions to prevent what would have been a covered loss. We remand with instructions that the fact finder determine which, if any, of Wolstein's claimed expenses were reasonably incurred to safeguard the yacht from vandalism and severe weather-related damage from the time of abandonment to the time coverage lapsed.

## FACTS

Bertram Wolstein entered into a contract with Burger Boat Company of Manitowoc, Wisconsin for the construction of a 105-foot, $4,487,608 yacht on May 25, 1989. At the time of contracting, Burger Boat had been recently purchased by Tacoma Boatbuilding Company (Tacoma Boat). The construction contract set out time lines for payment and completion of the yacht and required Burger Boat to procure standard marine builder's risk insurance covering itself and Wolstein, as an additional assured,

against all risks of physical loss of or damage to the yacht. Burger Boat insured the yacht under the marine builder's risk policy that its parent, Tacoma Boat, had placed on the London insurance market in 1988 and listed Wolstein as an additional assured under the policy.

Wolstein claims that Burger Boat abandoned work on the yacht as a direct result of the Tacoma Boat directors improperly and illegally diverting Wolstein's progress payments from Burger Boat to satisfy Tacoma Boat's debts or to pay Tacoma Boat's officers and directors. Without access to Wolstein's progress payments, Burger Boat was unable to purchase the necessary parts and supplies or pay its employees, and on November 30, 1990, Burger Boat shut its doors, locked out its employees, and abandoned the boat yard. The marine builder's insurance policy was terminated on December 13, 1990, because of Tacoma Boat's failure to pay the insurance premiums beginning April 1990. Almost two years later and without again opening for business, Burger Boat filed for bankruptcy in October 1992.

Upon learning of Burger Boat's closing and its abandonment of his yacht, Wolstein traveled to Manitowoc, hired security personnel to safeguard the vessel, and arranged for the resumption of utilities in order to ensure that his yacht would not be damaged by the Wisconsin winter weather. Wolstein formed Manitowoc Boat Works Corporation, which took over and completed construction of his yacht, the M/V *Lady Iris*. Wolstein contemporaneously assigned all of his rights under the yacht construction contract to the Lady Iris Corporation, a closely held corporation in which he and his wife were the officers and directors. The *Lady Iris* was delivered to the Lady Iris Corporation in August 1991, a year later than the originally scheduled completion date.

Wolstein claims that he paid a total of $6,803,299 instead of the original contract price of $4,487,608 for the construction of the *Lady Iris*. In 1996, Wolstein filed an insurance claim under Tacoma Boat's marine builder's risk policy for losses resulting from Burger Boat's failure to complete the

yacht. The insurance underwriters denied his claim, and he filed suit in King County Superior Court on September 27, 1996. According to Wolstein, the policy was an all risks policy and therefore covered repairs resulting from losses that flowed from Burger Boat's bankruptcy. These losses included design and workmanship defects, loss of charter fees resulting from the year delay in launching the boat, and additional costs incurred in completing the *Lady Iris*. The underwriters moved for summary judgment on April 24, 1998, on the alternate bases that Wolstein's damages were not covered and that whatever damages did occur, occurred after the policy had been canceled. The court granted summary judgment dismissing all of Wolstein's claims with prejudice on May 22, 1998.

Wolstein argues that the trial court erred as a matter of law by finding that his losses were not covered by the insurance policy's sue and labor, hull risks, and failure to launch provisions.

## DISCUSSION

### Standard of Review

■■ ■ This court reviews summary judgment orders de novo. *Key Tronic Corp., Inc. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wn.2d 618, 623-24, 881 P.2d 201 (1994). Summary judgment is proper if the pleadings and supporting declarations show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Key Tronic*, 124 Wn.2d at 624. Facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 452, 842 P.2d 956 (1993).

While the trial court dismissed Wolstein's causes of actions by finding that coverage under the policy did not exist, the underwriters also argued that Wolstein did not have standing to bring this action because he assigned all of his rights under the *Lady Iris* construction contract to

the Lady Iris Corporation. They raise standing again on appeal as an alternate basis for affirming the dismissal of Wolstein's claims. Because standing is a threshold issue, we address it first and hold that Wolstein has standing to bring this action due to his insurable interest in the *Lady Iris*. Following the standing analysis, we address Wolstein's claims under the marine builder's risk insurance policy.

Standing

■ The underwriters assert that Wolstein does not have standing to pursue an insurance claim against them because he assigned all of his rights to enforce the construction contract to the Lady Iris Corporation. Wolstein answers with a three-prong response. First, Wolstein notes that the trial court, while presented with this issue, did not rule on Wolstein's standing as part of its summary judgment order. Thus, Wolstein asserts that the only inference that can be made is that the court considered him to have standing. Regardless of the trial court's position, we review issues of standing de novo.

■ Next, Wolstein argues that the issue of his standing is not properly before this court because the underwriters did not file a cross appeal. Wolstein, however, fails to support this assertion with authority. The rules of appellate procedure differentiate between respondents raising additional grounds for affirming a decision and asking for affirmative relief. Appellate courts "will at the instance of the respondent, review those acts in the proceeding below which if repeated on remand would constitute error prejudicial to respondent." RAP 2.4(a). Under RAP 5.1(d), a notice of a cross appeal is essential if a respondent seeks affirmative relief as distinguished from urging additional grounds for affirmance. *Phillips Bldg. Co. v. An*, 81 Wn. App. 696, 700 n.3, 915 P.2d 1146 (1996) (citing *Nord v. Phipps*, 18 Wn. App. 262, 266 n.3, 566 P.2d 1294 (1977)); *see also* 3 Lewis H. Orland & Karl B. Tegland, Washington Practice: Rules Practice 48 (5th ed. 1998)). Here, the underwriters' challenge to Wolstein's standing is an additional basis for affirming the trial court's summary judgment or-

der, and they accordingly did not need to file a cross appeal in order for the issue to be properly before us.

 Finally, Wolstein claims that regardless of the ramifications of the assignment of his interests in the construction contract to the Lady Iris Corporation, he has standing to bring this action because he had an insurable interest in the *Lady Iris*. Wolstein claims that his insurable interest arose by virtue of his personally guaranteeing the *Lady Iris* construction loan as well as being a named party under the marine builder's risk insurance policy.

Wolstein does not support his position on the issue of whether a personal guarantor of a construction loan has standing to sue the insurer of the construction project with Washington law, and none was independently located. Wolstein relies on general statements of insurable interests as well as a 1974 Florida decision holding that a personal guarantor of a loan retains an insurable interest in property when the property is also security for the loan. *See Cincinnati Ins. Co. v. Palmer*, 297 So. 2d 96, 98 (Fla. Dist. Ct. App. 1974). The plaintiff in *Cincinnati* had an interest in the insurance on a building in which he had personally guaranteed a loan. The court in that case stated that the plaintiff remained liable on his personal guarantee of the loan and "[s]ince the risk of his having to make good on his personal guarantee would be increased in direct proportion to the extent that the primary security might sustain loss, he had an insurable interest to the full extent of the policy proceeds." *Id.* at 98.

Wolstein is similarly situated as the plaintiff in *Cincinnati* because he personally guaranteed the *Lady Iris* construction loan. Washington's statute on insurance contracts defines an insurable interest as "any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage." RCW 48.18.040(2). This court has previously interpreted this statute to permit any legal or equitable interest to create an insurable interest. *CLS Mortgage, Inc. v. Bruno*, 86 Wn. App. 390, 394, 937 P.2d

1106 (1997). Accordingly, we agree with Wolstein that his status as a guarantor of a loan resulted in him having an insurable interest in the *Lady Iris*, and he therefore has standing to pursue this lawsuit.

### Insurance Coverage

Wolstein claims that all of his losses (i.e., lost charter fees, repairs, and cost overruns) directly resulted from Burger Boat's bankruptcy and that these expenses were subject to reimbursement under the all risk marine builder's risk insurance policy. Wolstein lumps all of his losses together and argues that the court erred in finding that the losses were not covered by the sue and labor, hull risks, and failure to launch clauses of the marine builder's risk insurance policy. The underwriters, on the other hand, first separate out the types of losses claimed by Wolstein and argue that policy exclusions omit coverage for lost charter fees and that the policy does not cover expenses incurred to repair substandard initial construction. The underwriters note that the policy was canceled on December 13, 1990, as a result of Tacoma Boat's failure to pay the insurance premiums and argue that even if the expenses incurred by Wolstein were of the type covered by the builder's risk policy, the losses occurred after the policy had been canceled. It is only after these issues are addressed that the underwriters argue that the casualty incurred by Wolstein was not covered by the hull risks, failure to launch, or sue and labor provisions of the insurance policy.

The trial court did not separately address whether the policy covered loss of use, repair expenses, and cost overrun damages. Instead, the court dismissed Wolstein's claims by finding that no covered loss occurred during the period in which the insurance policy was in force. In its oral ruling the trial court stated:

> [T]here was in fact no physical loss or damage to the vessel occurring during the currency of the policy. I would further conclude that there was not a failure to launch in the sense that that term was used in the insurance contract.

The parties to that contract, I believe, were of the same state of mind that is industry standard in both the boat building and the insurance industry. The parties to the contract were each of them from those communities and, I believe, have the same understanding of the failure to launch clause; that is, that it related to difficulties arising during the process of launching the vessel.

To adopt the broader definition of that phrase that has been argued for I believe would transform the provision into a performance bond. The insurer would in that case be guaranteeing that the boat builder would meet the contractual terms and launch the vessel at the appointed time.

Finally, the Court would conclude that there being no covered loss under the policy, that the sue and labor provision is simply not applicable. So, I would intend to grant the motion for summary judgment.

The summary judgment order itself does not state the reasoning of the court in granting summary judgment. Instead, the order states only that the court has considered the record and grants summary judgment in favor of the underwriters. Although we review summary judgment orders de novo, the trial court's oral opinion provides insight into the court's reasoning and enables us to more clearly address the trial court's ruling.

■ ■ In our review of the issues, we first determine whether any of Wolstein's expenses were excluded from coverage. We then turn to coverage under each contested provision, and only if coverage for the type of losses is found do we evaluate whether the loss occurred while the policy was in effect. Policies of marine insurance are interpreted according to state law in the absence of a statute, judicially created maritime law, or a substantial need for a uniform rule. *See, e.g., Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 321, 75 S. Ct. 368, 99 L. Ed. 337 (1955). The insurance policy in this case should be interpreted consistently with Washington law as the *Lady Iris* was covered under Tacoma Boat's marine builder's risk insurance policy that was entered in Washington and the *Lady*

*Iris* was not subject to maritime law until successfully launched. *See, e.g., Bender Shipbuilding & Repair Co. v. Brasileiro*, 874 F.2d 1551, 1555 n.3 (11th Cir. 1989) (citing cases for the statement of law that until completed and launched, a ship is not subject to admiralty jurisdiction).

The interpretation of an insurance policy is a question of law with summary judgment appropriate if the contract has only one reasonable meaning when viewed in light of the parties' objective manifestations. *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997). Technical language in a policy will be given effect if it is clear that both parties to the contract intended that the language have a technical meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 882, 784 P.2d 507, 87 A.L.R.4TH 405 (1990). Absent mutual agreement on the meaning of the language, the words will be given their plain, ordinary meaning. *Id.* at 882 (citing *Farmers Ins. Co. v. Miller*, 87 Wn.2d 70, 73, 549 P.2d 9 (1976)). Insurance policies are to be construed as a whole, with force and effect given to each clause. *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *supplemented by* 123 Wn.2d 131 (1994).

Policy Exclusions

Wolstein claimed $300,000 in lost charter hire because of the year delay in launching the *Lady Iris*. But, the insurance policy, in its War, Strikes, and Other Exclusion section expressly excluded coverage for "[d]elay or disruption of any type whatsoever, including, but not limited to, loss of earnings or use of the Vessel, howsoever caused, except to the extent, if any, covered by the Collision Liability or the Protection and Indemnity [P&I] clauses of this Policy[.]" Because coverage under the collision liability or P&I clauses of the policy is not at issue, the policy excludes coverage for Wolstein's lost charter hire revenue.

Repair and Cost Overrun Expenses

Wolstein also claimed over $330,000 in repair expenses. Wolstein claims that a covered loss occurred as a result of Tacoma Boat's mismanagement of Wolstein's progress pay-

ments, which resulted in the lack of adequate and appropriate supplies. The underwriters counter that repair and warranty items resulting from faulty original construction are not covered by the policy unless they contribute to a loss caused by accident. While there is no Washington case law directly on point, there is persuasive authority from the Fifth Circuit and the Texas appeals court that supports the underwriters' position. *See Trinity Indus., Inc. v. Insurance Co. of N. Am.*, 916 F.2d 267 (5th Cir. 1990); *North Am. Shipbuilding, Inc. v. Southern Marine & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 831 (Tex. Ct. App. 1996). As explained in the following analysis of the policy's hull risks provision, we find *Trinity* and *North Am. Shipbuilding* persuasive and conclude that Wolstein's repair, warranty, and cost overrun expenses were not covered casualties.

Hull Risks

The hull risk provision of the builder's risk insurance policy in this case is an "all risks" policy as evidenced by the following:

> This Policy insures against all risks of physical loss of or damage to the Vessel occurring during the currency of this Policy, except as hereinafter provided.

> In the event that faulty design of any part or parts should cause physical loss of or damage to the Vessel, this insurance shall not cover the cost or expense of repairing, replacing or renewing such part or parts, nor any expenditure incurred by reason of betterment or alteration in design.

Wolstein argues that dishonesty and insolvency are covered risks under an all risks policy because they are not expressly excluded. In support of this position, Wolstein cites a British case that purportedly holds that the costs of recovering abandoned shipping containers were covered under the sue and labor clause of the containers' owner's insurance. *See ICS v. British Traders Ins. Co.*, 1984 LLOYD'S L. REP. 154. While Wolstein argues that the covered risks under the hull risks provision are identical to those under

the sue and labor provision, we note that unlike sue and labor, the insured object must sustain actual damage or be physically lost to invoke hull risks coverage. Burger Boat's financial difficulties, while prolonging completion of the *Lady Iris* and increasing the costs of her completion, did not inflict physical damage to the *Lady Iris* or result in the physical loss of the yacht. Thus, under the facts in this case, Burger Boat's bankruptcy did not create an injury recognizable under the hull risks provision of the builder's risk policy.

Furthermore, the phrase "all risks" must be read in context and be consistent with the purpose of the insurance. In addressing a similarly worded hull risks provision, the Fifth Circuit noted that the builder's risk policy in that case " 'insures against all risks of physical loss of or damage to the subject matter here insured[,]' " but stated that it had "trouble with the notion that a Builder's Risk policy covers the cost incurred by the policyholder to correct faulty workmanship." *Trinity*, 916 F.2d at 269. The plaintiff in *Trinity* was a boatbuilder who misaligned two modular hull sections during construction of a ship which resulted in a 7- to 12-inch twist in the vessel. The boat owner was awarded $200,000 in arbitration, and the builder sued the underwriter of its builder's risk insurance policy to recover sums that it had paid out because of the arbitration award. *Id.* at 268.

The *Trinity* court recognized that courts have used broad language in describing the extent of coverage provided by an all risks policy, but it was convinced that neither party intended for the builder's risk policy to cover the cost of repairing mistakes in construction. *Id.* at 269. In distinguishing previous cases where coverage was found to exist, the Trinity court noted that those cases dealt with accidents "caused by defective workmanship, not with the cost of replacing or repairing defective workmanship." *Id.* at 270 (citing *Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379 (5th Cir. 1981)). After discussing why builder's risk policies cover accidents resulting from the insured's defec-

tive workmanship,[1] the court concluded that "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state[.]" *Trinity*, 916 F.2d at 270-71.

Similarly, in evaluating language identical to that used in this case, a Texas appellate court relied upon *Trinity* and further noted that to hold that a builder's risk insurance policy covers defective workmanship would convert the policy into a performance bond. *North Am. Shipbuilding*, 930 S.W.2d at 834. In addition, in discussing the argument that the "all risks" policy covers all risks except those specifically excluded, the *North American Shipbuilding* court stated: "*Trinity* makes clear that these types of damages need not be 'excluded' from an all risks policy because they are not covered to begin with." *Id.* at 835. We are persuaded by the reasoning in these opinions and find that the hull risks provision of the builder's risk policy in this case does not provide coverage to pay for increased costs of completion due to the builder's bankruptcy or to repair faulty workmanship.

Failure to Launch

Wolstein next claims that the failure to launch provision

---

[1]The *Trinity* court stated:

"While the distinction [between accident caused damage and faulty initial construction] is perhaps difficult to see as an abstract concept, it appears relatively clear as a practical matter. Many construction accidents can be traced, at least in part, to some negligence on behalf of the insured. Defective workmanship can lead to the collapse of a cement dome or brick wall. If an all risks policy did not cover accidents resulting from such negligence, then perhaps it would become a no risk policy, as one plaintiff has suggested.

"That it should cover accidents caused by the negligence of the insured does not justify reading such a policy to cover the costs of replacing or repairing crooked window frames or crooked door frames, even though the crookedness of the frame was undoubtedly the result of the insured's negligence.

". . . .

"Thus, when an insured has made claims for the collapse of the insured subject matter because of faulty design, district courts have awarded as damages the cost to rebuild the structure in its defective state. They have not awarded as damages the cost to redesign or rebuild the structure so as to eliminate the defect. This reflects an interpretation of the all risks policy to cover accidents resulting from defective design or workmanship, but not the cost of repairing the defect itself." *Trinity*, 916 F.2d at 270 (footnotes omitted).

of the insurance policy covers his losses because Burger Boat did not launch the *Lady Iris* by the contracted for launch date of July 28, 1990. The failure to launch clause states: "In case of failure to launch, the Underwriters shall bear, up to the Amount Insured Hereunder, their proportion of all necessary expenses incurred in completing [the] launch." Wolstein again relies on an expansive reading of the provision, while the underwriters urge this court to agree with the trial court's finding that common usage of the term "failure to launch" applies to casualties incurred during an attempted but unsuccessful launch of a vessel.

The parties to the contract were Tacoma Boat and the underwriters.[2] Both parties were familiar with builder's risk insurance policies, and no evidence is presented to contradict the trial court's conclusion that they both intended and understood the failure to launch clause to cover damages arising during the process of launching the vessel. Given the parties' familiarity with the industry's interpretation of the phrase "failure to launch," the court's conclusion was a reasonable inference. Moreover, as pointed out by the trial court, "[t]o adopt the broader definition of [the failure to launch] phrase that has been argued for [by Wolstein] would transform the provision into a performance bond. The insurer would in that case be guaranteeing that the boat builder would meet the contractual terms and launch the vessel at the appointed time."

Wolstein argues that a broad interpretation of the phrase "failure to launch" should apply because he was not aware of the technical interpretation given to the phrase. However, Wolstein was an additional assured, not a party to the insurance contract. Therefore, the canon of insurance policy construction that provides that the plain or ordinary meaning of a phrase will control over its technical meaning when mutual agreement as to the meaning is lacking does not apply. *See Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 882, 784 P.2d 507, 87 A.L.R.4TH 405 (1990).

---

[2]Wolstein was not a party to the insurance contract but was included on the policy as a loss payee.

Furthermore, the word "failure" is commonly used to describe a situation where something was attempted but not successfully completed. Thus, even if we were to interpret the failure to launch provision consistent with its plain meaning, failure to launch would apply to only those launches that were attempted but not successfully completed.

Next, Wolstein argues that giving the failure to launch provision a narrow reading that covers only damage that occurs during a failed launch violates canons of construction for interpreting insurance policies because each clause in the policy is to be given effect and no clause should be rendered superfluous. *See American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *supplemented by* 123 Wn.2d 131 (1994). According to Wolstein, a narrow interpretation of the failure to launch provision will add nothing to the insurance coverage because damage to the vessel during launch is already covered by the all risk nature of the hull risks provision. Wolstein is mistaken. The failure to launch provision covers "all necessary expenses incurred in completing [the] launch," which could include repairs to marine railways, docks, and other nonvessel items damaged in an unsuccessful launch that are necessary to complete a launch. These items are not covered by other provisions of the policy.

Accordingly, we affirm the trial court's dismissal of Wolstein's failure to launch cause of action.

## Sue and Labor

 Sue and labor provisions of an insurance policy require the assured to take action to prevent or mitigate the damage sustained by the insured vessel. The sue and labor clause in this case provided in pertinent part:

> And in case of any Loss or Misfortune, it shall be lawful and necessary for the Assured, their factors, Servants and Assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the Vessel, or any part thereof[.]

> In the event of expenditure under the Sue and Labor clause,

the Underwriters shall pay the proportion of such expenses that the Amount Insured Hereunder bears to the Agreed Value[.]

Both Wolstein and the underwriters agree that Wolstein's expenses in protecting the vessel from damage as a result of Burger Boat's insolvency and abandonment of the *Lady Iris* are covered if they were reasonably incurred to prevent or avoid a covered loss. The underwriters argue first that the expenses were not reasonably incurred in that they were not incurred for the primary benefit of the underwriters. Second, they argue that the record does not show that any physical loss or damage to the vessel had occurred, was occurring, or was imminent while the policy was in effect and that since no covered loss occurred, there can be no recovery under the sue and labor provision.

The trial court agreed with the underwriters' second argument and found that Wolstein had no claim under the sue and labor clause because there was no recognizable injury to the vessel under either the hull risk or failure to launch provision. But, a covered loss does not have to occur in order to invoke coverage under the sue and labor provision. Rather, actions taken to prevent a covered loss will suffice to invoke coverage. *See White Star S.S. Co. v. North British & Mercantile Ins. Co.*, 48 F. Supp. 808, 813 (E.D. Mich. 1943).

Wolstein argues that his prompt action in hiring 24-hour security and ensuring that utilities were available prevented vandalism or severe winter-weather-related damage that could have resulted from Burger Boat's abandonment of the *Lady Iris*. Had either of these events occurred and resulted in damage to the *Lady Iris*, the casualty would have been covered under the hull risks provision because neither vandalism nor severe weather-related damage was excluded from coverage.

The underwriters argue that the risk of harm was not immediate as evidenced by Wolstein's delay in taking preventative actions until after the policy expired. Yet the record, taken in the light most favorable to Wolstein, shows

that before coverage lapsed and immediately upon learning of the Burger Boat shut down, Wolstein traveled to Wisconsin and obtained security and utilities to protect the *Lady Iris*. The underwriters also claim that Wolstein's actions to enforce the construction contract with Burger Boat were evidence of Wolstein's own belief that the risk of harm was not imminent. However, no rule of law prevents a party from seeking redress from multiple parties under several different theories of recovery. We find nothing inconsistent about Wolstein's pursuit of several different avenues to safeguard the *Lady Iris* and ensure her timely and cost-effective completion.

The underwriters next argue that the record fails to show that the risk of damage to the *Lady Iris* was imminent and that Wolstein's actions were therefore unnecessary. Wolstein counters that "applicable case law requires only 'reasonable threat of damage' " and cites a vacated bankruptcy case in support of his position. *States S.S. Co. v. Aetna Ins. Co.*, 59 B.R. 314, *vacated*, 77 B.R. 753 (N.D. Cal. 1985)). The phrase "reasonable threat of damage" does not exist in *States S.S.* Instead, *States S.S.* follows British authority which purportedly stands for the proposition that reasonable expenses incurred by the assured to minimize or avert a loss which results or may result from a covered peril are recoverable. *States S.S.*, 59 B.R. at 317 (citing *ICS v. British Traders Ins. Co.*, 1984 LLOYD's L. REP. 154).

While we accord little weight to the vacated *States S.S.* decision, we hold that just as the expenses will be reviewed for reasonableness, an assured's actions will also be reviewed for reasonableness. After all,

> [a]n insured has the duty to exercise the care of a prudent, uninsured owner to protect insured property so as to minimize or prevent the loss for which the insurer would be liable. The purpose of the sue and labor clause is to reimburse the insured for those expenditures which are made primarily for the benefit of the insurer to reduce or eliminate a covered loss.

*Blasser Bros. v. Northern Pan-Am. Line*, 628 F.2d 376, 386

(5th Cir. 1980). To require that a risk be imminent before coverage results would create a dilemma for the assured. The assured would be placed in the unenviable position of determining whether there was enough evidence to support the immediacy of their action and thus allow reimbursement from their insurance policy, or whether they should refrain from acting and risk that damage will occur and that insurance coverage will be denied because they failed to act to prevent the casualty. On the other hand, an assured should be able to determine what actions and expenses are reasonable without too much difficulty.

As applied to the case at hand, Wolstein was faced with the realization that his partially completed yacht was vulnerable to vandalism as a result of being in an unsecured area and was susceptible to severe weather-induced damage as a result of being in an unheated space during a Wisconsin winter. Had either of these events occurred while the policy was in force, the resulting damage would have been covered under the hull risks provision of the insurance policy. While no one can say with certainty that the *Lady Iris* would have incurred damage from these events, we find that Wolstein presented enough evidence to create a genuine issue of fact as to whether his actions were reasonable given the circumstances. A prudent, uninsured owner would have also taken action to secure and heat an abandoned partially completed yacht in an outdoor Wisconsin boatyard in winter. Thus, those actions determined by the finder of fact to be reasonable and taken while the policy was in effect are covered under the sue and labor provision.

Not only will a determination of reasonableness of the claimed expenses be necessary, but also only those costs incurred while the policy was in effect are reimbursable. First, we note that the *Lady Iris* was abandoned sometime in November 1990 and the insurance policy expired on December 13, 1990. While Wolstein argues that all his damages flowed from the risk of loss that occurred when Burger Boat abandoned the *Lady Iris*, we note that no covered loss

actually occurred while the policy was in force. A distinction exists between damages that flow from losses that occur during coverage and a continuation of expenses to prevent a loss from occurring in the first place. Once the policy expired, the underwriters were no longer liable for any new losses, and whatever action Wolstein took after coverage lapsed could not affect the underwriters' liability one way or the other. Since the underwriters, in this case, were no longer liable for new losses once the policy lapsed and no covered peril had actually occurred, they received no benefit from Wolstein's mitigating actions taken after December 13, 1990. It would be contrary to the purpose of the sue and labor provision to continue to hold the underwriters liable for Wolstein's security and utility expenses incurred after the policy expired because the underwriters were not liable for any losses that occurred after coverage lapsed.

Wolstein also claimed under the sue and labor provision all the costs he incurred in completing the *Lady Iris* that were in excess of the original contract price and subsequent change orders. But, as previously stated, the sue and labor clause covers only those expenses reasonably incurred in an effort to prevent or mitigate a covered loss. The builder's risk policy was not a performance bond, and it is unreasonable to infer that the parties intended for the policy to cover the cost of completing the vessel if Burger Boat ceased to exist. Rather, it is only those expenses reasonably incurred and directly related to safeguarding the *Lady Iris* from the risk of vandalism or damage from extreme weather conditions from Burger Boat's abandonment of the *Lady Iris* until the date coverage lapsed that are recoverable under the sue and labor provision.

In sum, the trial court correctly dismissed Wolstein's claims for loss of charter fees and for damages under the hull risks and failure to launch clauses of the marine builder's risk insurance policy, and those portions of the court's order are affirmed. The court erred in dismissing Wolstein's sue and labor cause of action on the grounds

that there was no covered loss under the hull risk or failure to launch clause. When viewed in the light most favorable to Wolstein, his actions in obtaining security and heat for the *Lady Iris* after abandonment by Burger Boat were reasonable to prevent damage to the vessel. Accordingly, we reverse the trial court's summary judgment on the sue and labor provision and remand for proceedings consistent with this opinion.

AGID, A.C.J., and BAKER, J., concur.